**Affirmed and Memorandum Opinion filed October 16, 2012.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-11-00499-CV

---

### JIMMY O. BAILEY, Appellant

### V.

### CHRISTY HOOVER THOMPSON, Appellee

---

**On Appeal from the 253rd District Court
Chambers County, Texas
Trial Court Cause No. 25449**

---

## M E M O R A N D U M    O P I N I O N

Appellant Jimmy O. Bailey appeals the trial court's judgment establishing that an informal marriage[1] existed between Jimmy and appellee Christy Hoover Thompson. Jimmy also challenges the trial court's property division. Jimmy contends that the "trial court abused its discretion because the evidence is factually and legally insufficient to establish that Jimmy and Christy had an agreement to be married" and "held themselves out as being married." He also contends that the trial court abused its discretion by

---

[1] "Informal marriage" is the statutory term used to describe what is colloquially known as a common law marriage. *See* Tex. Fam. Code § 2.401(a)(2) (Vernon 2006).

dividing his retirement account because "the parties were not married; alternatively, the parties were not married on September 20, 2005." We affirm the trial court's judgment.

## Background

Christy sued for divorce and sought a property division based on allegations that she and Jimmy had established an informal marriage. The marriage and property division issues were bifurcated and tried separately. On November 17, 2010 and December 16, 2010, a bench trial was held on the issue of informal marriage.

At trial, Christy testified that she has three daughters: Ashley Hoover and twins Teri Rae and Taylor Lea Thompson. Christy testified that she met Jimmy in January 2005, and that he moved into her home on Fleetwood Street in Baytown in March 2005. At that time, the twins were attending high school and still were living with Christy; Ashley had moved out to attend college. Christy stated that she and Jimmy "separated in June 2005 for maybe 20 days;" after that, Jimmy moved back to her home. Christy acknowledged that Jimmy maintained an apartment until January or February 2006, but stated that he did so because he "couldn't break his lease."

Christy could not point to an exact date when she and Jimmy agreed to be married; she stated that they "discussed it in the summer of 2005" before she and Jimmy went to buy a ring for her. According to Christy, Jimmy bought her engagement ring and wedding band on August 20, 2005. Christy testified that she was very surprised when Jimmy took her to the jewelry store to buy rings; she also testified that the diamond solitaire used in her ring came from a ring she already owned.

The parties decided in September 2005 to purchase a home together on Black Cherry Lane in Baytown and signed a contract with Kimball Hill Homes at that time. Christy and Jimmy broke ground on the new home on September 20, 2005. That same day, Christy put the wedding band on and Jimmy told her "you might as well wear the wedding ring, too." Christy testified that "it was agreed" they were married, and that she and Jimmy "were joining [their] lives together at that point." According to Christy, she

2

always wore the wedding band after September 20, 2005.

Christy testified that she was worried about selling her home on Fleetwood Street and moving her children. When she and Jimmy signed the contract to purchase the Black Cherry Lane house, Jimmy told her not to worry because the new house would be "our home" and "everything is 50/50" because we "were married." The proceeds from Christy's home sale were used as a down payment for the new house on Black Cherry Lane.

Christy noticed at closing that the Black Cherry Lane house was titled only in Jimmy's name, and her name was not included in the paperwork. When Christy asked about the omission of her name, Jimmy told her to "hush, we'll talk about it later. . . . Don't worry, it's 50/50" because "we were married." Jimmy later told Christy that her name was omitted because her unfavorable credit score would have increased the mortgage interest rate by a quarter percent. The Uniform Residential Loan Application of October 3, 2005 reflects that Jimmy applied for new home loan as an "unmarried." The general warranty deed for the Black Cherry Lane house is in Jimmy's name alone, and he is named as a "single person."

Christy and Jimmy opened a joint bank account with right of survivorship on January 13, 2006. Christy testified that she only put money into the account; Jimmy was in charge of the joint account, balanced the bank statements, and transferred money in and out of the account at will. Christy testified that the joint account was not used to pay general household bills because Jimmy "accidentally set up the household bills" on his online account. Christy's pay checks and child support checks were deposited into the joint account; Jimmy transferred money out of the joint account into his personal account to pay bills. Christy also testified that Jimmy paid her credit card bills and used her Discover and Sears credit cards to make purchases and transfers. Christy did not have access to Jimmy's personal account and never had an ATM card linked to his account.

According to Christy, Jimmy also filed the parties' taxes. Christy trusted Jimmy to take care of the taxes because he is an accountant. Jimmy never showed her the tax

3

returns or asked her to sign them. Christy's 2007 tax return was admitted into evidence; it indicates that she filed as "head of household," marital status "divorced." Ashley's FAFSA[2] application also was admitted into evidence; the box relating to Christy's marital status on the FAFSA indicated "Divorced/Separated" and the box relating to a stepfather's name and information was left blank. Christy testified that Ashley filled out the form herself. Jimmy contended at trial that Christy filled out Ashley's FAFSA application.

Christy testified that their neighbors on Black Cherry Lane knew Christy and Jimmy "as a married couple." Christy and Jimmy did "everything together as a couple, everything . . . from grocery shopping to the kids' fund-raisers." Christy testified that she and Jimmy worked many hours at the Toyota Center raising funds for the kids to go on a school trip to California. In connection with this fundraising project, Christy and Jimmy each attended a class and submitted information for a criminal background check. According to Christy, she and Jimmy each filled out the necessary paperwork individually. Although Christy could not remember if the paperwork inquired about marital status, she did remember that the paperwork inquired about the signer's relationship to the child.

Christy's colleagues at work also assumed she was married because she wore a wedding ring and "conducted [her]self as a married woman." She and Jimmy went to every company party together. Christy testified that Jimmy "identified" her as his wife "more than once" during the four and a half years she and Jimmy were together,

Christy testified that she was shocked when Jimmy told her in January 2009 that "the relationship of the marriage" was over. She testified that Jimmy sent her an e-mail containing what she considered to be an agreement regarding property division. She felt pressured to buy the house from Jimmy because he said that it was his house and she did not want to move her daughters before their senior year. She bought the house on April

---

[2] FAFSA is the Free Application for Federal Student Aid.

4

1, 2009, and Jimmy moved out the next day. Christy acknowledged that she did not protest to anyone during the 2009 closing that the deed identified both Jimmy and her as a "single person." She stated that she did not read the deed before signing it, and that she would have signed anything at closing to keep her children in the home.

Christy's daughter, Teri Rae Thompson, testified that Jimmy moved into Christy's home on Fleetwood Street in 2005. Teri testified that Jimmy was her stepfather and that he was introduced as her stepfather "any time" there was a school event. Jimmy was introduced as Teri's stepfather to her three band directors, her basketball coach, teachers, and friends' parents. Jimmy volunteered as Teri's stepfather to be the liaison between Exxon and Teri's school band for fundraising purposes. According to Teri, Jimmy personally introduced himself as her stepfather to her band director. Jimmy never said he was not Teri's stepfather and never objected to being called Teri's stepfather.

When asked if she had any documentation that would show that her mother and Jimmy were married, Teri testified that there are school documents that had to be filled out. She referred to several school papers including a criminal background check that had to be filled out in order to participate in a school fundraiser at the Toyota Center. Teri stated that parents, guardians, "aunts, uncles, stepmoms, stepdads, mother, father, grandparents" could participate in the Toyota Center fundraiser, but that friends of the family were not allowed to participate. Teri also testified that Christy told her "these are my wedding rings purchased for me by [Jimmy]." Christy wore her rings "all the time" and Jimmy also wore a gold wedding band.

Christy's mother, Audrey Hoover, testified that once Christy and Jimmy bought a house together "for the two of them and the kids," the family accepted and assumed that they were married even though the parties never overtly said they had decided to get married. Audrey believed they were married because Christy sold her home and they bought a house together, had a bank account together, and took trips together. A birthday card for Jimmy from Christy's parents was introduced into evidence. The card identified Jimmy as their "son-in-law." Jimmy never said he was not Audrey's son-in-law.

Christy's father, Ronald Lee Hoover, testified that Christy brought Jimmy to the Hoover's house in 2005. By the time Christy and Jimmy built a house together, Ronald "considered them to be common-law married." Ronald testified that Christy and Jimmy attended a Thanksgiving family gathering in 2005, at which Christy wore a wedding ring and told her family that Jimmy had given her the wedding ring. Christy showed off her wedding ring and the family was excited that "she did have a ring" and congratulated both Christy and Jimmy. Ronald agreed that he knew that Christy and Jimmy were "living together as man and wife" and "agree[d] to do the sorts of things together that married people do together." Ronald also testified that he heard Jimmy introduce himself as Teri and Taylor's stepfather at one of the school's band fundraising events.

Christy's friend, Rachael Marie Hernandez, testified that she and Christy became friends when they worked for the same company. Rachael recalled that Christy introduced Jimmy as her husband at the company's Christmas party in 2007 or 2008. Christy stated "This is my husband" and Jimmy and Rachael shook hands. Rachael testified that Christy did not tell her she was married prior to the Christmas party because "it never came up" and Rachael "always assumed" Christy was married because she wore a wedding ring.

The parties' neighbor, Joshua Steven Bailey,[3] testified that he met Jimmy in 2006 after moving into the house next door to Jimmy and Christy's house on Black Cherry Lane. Joshua testified that Jimmy introduced himself and told Joshua that he is living in the house with "his wife, Christy," and "the kids." Joshua stated that Jimmy said "'I'm [Jimmy] Bailey and my wife, Christy,' and then the kids." Joshua testified that once Christy was introduced as "Mrs. Bailey, . . . it never came back up." Joshua also testified that, during a dinner with Christy, Jimmy, and Jimmy's son, Joshua asked Jimmy's son, "How long have your mom and dad been married?" According to Joshua, Jimmy's son gave Joshua "a funny look" and said "about a year and-a-half."

---

[3] Jimmy and Joshua Steven Bailey are not related.

Jimmy's 25-year-old son, Joshua Bryant Bailey,[4] testified that he came to live with Jimmy and Christy in July 2006 and stayed with them until August 2007. Bryant testified that, when he asked Jimmy and Christy if they were getting married, Christy personally told Bryant that they would not get married because Ashley was receiving financial aid and federal grants to go to school and because of inheritance "it would just end up too complicated." Bryant stated that he never observed Jimmy holding Christy out as his wife or introducing her as his wife.

Bryant also testified that he never had a conversation with neighbor Joshua about Christy and Jimmy's marital status. Bryant denied that Joshua ever asked him how long Jimmy and Christy had been married; Bryant also denied ever telling Joshua that Jimmy and Christy had been married for "about a year and-a-half." Bryant admitted that he had been arrested five times, but he denied ever being convicted of a felony.

Jimmy testified that he lived with Christy in 2005 "from time to time during the week, but [he] didn't move in permanently with her until the [new] home was purchased in April of 2006." Jimmy testified that he stayed in his apartment in Houston during the week and stayed with Christy on the weekends. Jimmy stated that he lived with Christy for a brief time when his lease expired in January or February 2006; then he, Christy, and the twins moved into a motel until the new house on Black Cherry Lane was built.

Jimmy acknowledged that he and Christy had an agreement to buy a house together and that both signed an agreement with Kimball Hill Homes to build a house. He stated testified that he agreed to be "50/50 partners with" Christy, but he also testified that the deed on the house was "made out to" him because it was his house. Jimmy claimed that Christy sold her house because she "said she had a lot of troubles with the house and she didn't want the house anymore."

Jimmy testified that he bought an engagement ring for Christy "at her behest" in August 2005. Jimmy knew at the time that Christy "was planning on using her own

_____

[4] We will refer to Joshua Bryant Bailey as "Bryant."

7

diamond" for the engagement ring because she had told him. He testified he also bought a wedding band because Christy "wanted the wedding band at the same time" as the engagement ring. Although he purchased a wedding set, Jimmy testified that the "wedding band was for a later use." When asked whether he ever objected to Christy wearing the "wedding set," Jimmy replied "Never noticed. Never paid any attention one way or the other." Jimmy claimed that Christy did not wear the wedding set consistently.

Jimmy testified that he started paying the bills in 2006 at Christy's request because she did not like to pay bills. Jimmy testified that "money was moved around all the time" with Christy's permission and that he transferred his personal balances to Christy's credit card. According to Jimmy, Christy had full access to every account; Christy denied having access to Jimmy's account. Jimmy claimed he used Christy's credit card only when he went shopping with Christy but never alone. He stated that ATM deposits may have gone into his account but that Christy's checks were only deposited in the joint checking account. Several checks that were payable to Christy but were deposited in Jimmy's personal account were admitted into evidence. Jimmy claimed that he did not know who deposited these checks payable to Christy into his personal account.

Jimmy testified he filed the parties' tax returns; he claimed he used a computer program and submitted all of Christy's information "at her behest with her sitting there at all times." Christy denied being present when Jimmy filed the tax returns. Jimmy testified that he filed the tax returns as "single" because he is not married; he never claimed Christy as a spouse. During the entire time the parties lived together, the tax returns were filed as "single" and "head of household." Jimmy also testified that he never claimed Christy was his wife on any job-related documents; he stated that his son was designated as the beneficiary of his benefits.

Jimmy claimed that he never agreed with Christy to be married and be "man and wife." Jimmy testified that the main reason he did not marry Christy was that "she did not want to be married because her daughter received free financial aid and she did not want to jeopardize that." Jimmy acknowledged attending Christmas parties with Christy

8

but stated that he did not know who Christy's friend Rachael is. Also, he claimed that his neighbor Joshua "stretched the truth" when he testified.

The trial court signed an interlocutory judgment on January 27, 2011, finding that an informal marriage existed and had commenced in September 2005. A bench trial was held on March 4, 2011 on property division. The trial court signed a final decree of divorce on March 25, 2011. The trial court issued written findings of fact and conclusions of law on April 25, 2011; the trial court found that Christy and Jimmy "entered into an informal marriage on September 20, 2005;" "co-habited as husband and wife in the state of Texas;" "agreed to be married;" and "held each other out in their community, among their professional associates, in their families, and among their social acquaintances as husband and wife." Jimmy filed a timely notice of appeal.

**Analysis**

**I.      Informal Marriage**

Jimmy argues in his first and second issues that the "trial court abused its discretion because the evidence is factually and legally insufficient to establish that Jimmy and Christy had an agreement to be married" and "held themselves out as being married in the state of Texas."

The findings of fact in a bench trial have the same force and dignity as a jury verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence by the same standards as applied in reviewing the legal and factual sufficiency of the evidence supporting a jury's findings. *Id.*

In a legal sufficiency review, we consider all of the evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not disregard it. *Id.* at 827. The

factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *Id*. at 819.

In a factual sufficiency review, we consider all the evidence for and against the challenged finding and set it aside only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406–07 (Tex. 1998); *Bush v. Bush*, 336 S.W.3d 722, 730 (Tex. App.—Houston [1st Dist.] 2010, no pet.). In a bench trial, the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony. *Bush*, 336 S.W.3d at 730.

An informal marriage exists in Texas if the parties (1) agreed to be married, (2) lived together in Texas as husband and wife after the agreement, and (3) there presented to others that they were married. *See* Tex. Fam. Code § 2.401(a)(2) (Vernon 2006); *Small v. McMaster*, 352 S.W.3d 280, 282 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). The existence of an informal marriage is a fact question, and the party seeking to establish existence of the marriage bears the burden of proving the three elements by a preponderance of the evidence. *Small*, 352 S.W.3d at 282-83. An informal marriage does not exist unless all three elements are present. *Id*. at 283; *Eris v. Phares*, 39 S.W.3d 708, 713 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). The elements of an informal marriage are determined on a case-by-case basis. *See Estate of Claveria v. Claveria*, 615 S.W.2d 164, 166 (Tex. 1981).

Jimmy challenges the sufficiency of the evidence establishing the agreement to be married and holding out; therefore, we will address only these two elements.

### 1.    Agreement to be Married

Jimmy argues that there is no evidence that the parties intended to have a present, immediate and permanent marital relationship because "Christy presented herself as single or married, depending on the situation and the benefit to her." Jimmy further

contends that he and Christy did not have an agreement to be married because, even though Christy testified that "they entered into the informal marriage in the summer of 2005," the "evidence was uncontroverted that Jimmy maintained an apartment in Houston until 2006." Jimmy also contends that Christy testified that the parties "agreed to be married when she started wearing the wedding band" but that "this one event changed each time Christy testified about it: Christy testified that it was a 'surprise' to go to the jewelry store and that she 'walked out of the store with a ring on her hand,' even though the engagement ring contained a diamond that Christy owned previously." Jimmy further argues that there was no evidence, other than Christy's statements, tending to establish that Jimmy agreed to be married.

To establish an agreement to be married, "the evidence must show the parties intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife." *Small*, 352 S.W.3d at 283 (quoting *Eris*, 39 S.W.3d at 714). A proponent may prove an agreement to be married by direct or circumstantial evidence or by conduct of the parties. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993). "Proof of cohabitation and representations to others that the couple are married may constitute circumstantial evidence of an agreement to be married." *Id*. The testimony of one of the parties to the marriage constitutes some direct evidence that the parties agreed to be married. *Small*, 352 S.W.3d at 283.

At trial, Christy testified that she and Jimmy discussed being married "in the summer of 2005" in August. After that, Jimmy bought Christy an engagement ring and wedding band on August 20, 2005. Christy testified that she and Jimmy broke ground on the home they bought together a month after Jimmy bought her engagement ring. She testified that on that same day she was playing with the wedding band and put it on her finger when Jimmy told her "you might as well wear the wedding ring, too." Christy testified that "it was agreed" that they were married, and that she and Jimmy "were joining [their] lives together. According to Christy, the parties did not have a formal wedding ceremony because they "had already been married before in the past" and "had

11

done the ceremonies" and "didn't have to go to a court to get married."

Jimmy testified that he never agreed with Christy to be married and be "man and wife." Jimmy claimed that the main reason he did not marry Christy was that "she did not want to be married because her daughter received free financial aid and she did not want to jeopardize that." Christy contradicted Jimmy's testimony and testified that she did not give him any reason to think she did not want to be married.

Jimmy's son, Bryant, testified that he asked the parties in July 2006 if they were planning on getting married and Christy told him that they would not get married because Ashley was receiving financial aid and grants. Bryant denied that he ever told neighbor Joshua that Jimmy and Christy had been married for "about a year and-a-half."

Jimmy also testified that he only stayed with Christy from time to time in 2005; he claimed staying in his apartment in Houston during the week and only staying with Christy on weekends. However, Christy claimed that Jimmy lived with her and her twins since March 2005 and only moved out once for a 20-day period in June 2005. She claimed that Jimmy maintained an apartment until January or February 2006 because he "couldn't break the lease."

Jimmy testified that he bought Christy an engagement ring "at her behest" in August 2005. Jimmy claimed that he knew at the time that Christy "was planning on using her own diamond" for the engagement ring because she had told him so. He testified that he also bought a wedding band because Christy "wanted the wedding band at the same time" as the engagement ring but that the "wedding band was for a later use." When asked whether he ever objected to Christy wearing the "wedding set," Jimmy replied "Never noticed. Never paid any attention one way or the other." Jimmy never denied wearing a wedding band himself.

Jimmy claims on appeal that the parties did not intent to have a marital relationship because (1) Christy knew the new home was "in Jimmy's name and did not complain because they got a better interest rate;" (2) when Christy bought the house from

12

Jimmy in 2009, "the deed reflects that they were both single people;" (3) Christy filed her 2007 tax return as a single person; and (4) Christy knew Ashley's application for financial aid reflected that Christy was not married.

However, Christy testified that she did question why her name was not included on any documents at the 2006 closing after both parties signed the contract with the builder. She testified that Jimmy told her "Hush, hush, hush. We'll talk about it later. . . . Don't worry, it's 50/50" because "we were married." Christy acknowledged that, when she bought the house from Jimmy in 2009, the deed reflected that she and Jimmy both were "single." She also stated that she "would have signed anything that day. My life was falling apart that day. I would have done anything to keep my home, my kids in the same home." Christy also testified that she did not read the deed before signing it; she was asked to sign the deed at the 2009 closing and she did.

Regarding the tax returns, Christy testified that she and Jimmy had an agreement that he would file the tax returns; she claimed she never was present when Jimmy prepared the tax returns and never signed anything. Christy also testified that Ashley filled out her financial aid application by herself.

The evidence referenced by Jimmy goes to the weight afforded the evidence and does not serve to negate an informal marriage. *See Quinn v. Milanizadeh*, No. 01-07-00489-CV, 2008 WL 1828327, at *5 (Tex. App.—Houston [1st Dist.] Apr. 24, 2008, no pet.) (mem. op.) (concluding that keeping separate bank accounts and filing tax returns as single persons did not negate existence of informal marriage but went to the weight of the evidence); *In re Giessel*, 734 S.W.2d 27, 31 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (concluding that proponent spouse's denial of marriage in tax returns, social security, driver's license, bank, and pay records did not negate existence of informal marriage but went to the weight of the evidence).

Based on the evidence before us, we conclude that the evidence is legally sufficient to support the trial court's finding that Jimmy and Christy had an agreement to be married. And although the evidence is conflicting, it turns on the witnesses'

credibility and demeanor; therefore, it was within the factfinder's purview to resolve and determine whether the parties agreed to be married. We cannot say the evidence of an agreement to be married is so weak as to render the trial court's finding clearly wrong and manifestly unjust.

Accordingly, we overrule Jimmy's first issue.

### 2.       Presenting to Others

Jimmy argues that there is "some evidence that Christy held herself out as married, but not in Texas" because "there was no testimony that any of the photos in which she was wearing the ring were taken in Texas." According to Jimmy, there is "a single undated reference to Jimmy holding himself out to his neighbor as married. Other than this one reference, there is no other reference tied to a date and the state of Texas." Jimmy also argues that "introducing Jimmy as her husband to a few people and wearing a wedding ring constitute insufficient evidence that Christy was married — especially considering that at other times, when it benefited her, she held herself out as a single person and knew that he held himself out as a single person."

The statutory requirement of "presenting to others" is synonymous with the judicial requirement of "holding out to the public." *Small*, 352 S.W.3d at 284-85; *Lee v. Lee*, 981 S.W.2d 903, 906 (Tex. App.—Houston [1st Dist.] 1998, no pet.). "Holding out" may be established by the conduct and actions of the parties; "[s]poken words are not necessary to establish representation as husband and wife." *Winfield v. Renfro*, 821 S.W.2d 640, 648 (Tex. App.—Houston [1st Dist.] 1991, writ denied). Occasional introductions as husband and wife are not sufficient to establish the element of holding out. *Small*, 352 S.W.3d at 285; *see also Ex parte Threet*, 160 Tex. 482, 333 S.W.2d 361, 364 (1960) (evidence that couple was introduced as husband and wife to a few friends and told two or three others that they were married was no evidence that they held themselves out as married). "[T]he element of presenting to others requires both parties to have represented themselves as married." *Small*, 352 S.W.3d at 285.

14

Determining whether the evidence is sufficient to establish that a couple held themselves out as husband and wife "turns on whether the couple had a reputation in the community for being married." *Small*, 352 S.W.3d at 285; *see also Danna v. Danna*, No. 05–05–00472–CV, 2006 WL 785621, at *1 (Tex. App.—Dallas Mar. 29, 2006, no pet.) (mem. op.) ("The couple's reputation in the community as being married is a significant factor in determining the holding out element."); *In re estate of Giessel*, 734 S.W.2d at 31 (holding that couple held themselves out as married when they had reputation in community for being married even though they had kept marriage secret from a few family members). "Proving a reputation for being married requires evidence that the couple 'consistently conducted themselves as husband and wife in the public eye or that the community viewed them as married.'" *Small*, 352 S.W.3d at 285 (quoting *Danna*, 2006 WL 785621, at *2).

Christy testified that Jimmy bought her an engagement ring on August 20, 2005. A month later Jimmy told Christy to wear the wedding band too because "it was agreed" that they were married. Christy testified that she always wore the wedding band from that day on. Teri confirmed that Christy always wore her wedding band; Teri also testified that Jimmy wore a wedding band. Jimmy did not deny wearing a wedding band.

On September 15, 2005, Christy and Jimmy both signed a contract to purchase a new house. Christy testified that when they moved into the new house, all their neighbors knew them "as a married couple." Christy testified that she and Jimmy did everything together as a couple . . . from grocery shopping to the kids' fundraisers."

Christy testified that she and Jimmy worked many hours at the Toyota Center to raise funds for Teri's school trip. Prior to working at the Center, Jimmy and Christy each filled out paperwork on which they were required to state that they were related to Teri. Jimmy never denied filling out this paperwork or stating on the paperwork that he was related to Teri. Teri confirmed that this paperwork needed to be filled out and that only family members were allowed to work at the Center.

Jimmy and Christy also opened a joint bank account with right of survivorship.

15

Christy testified that Jimmy was in charge of the joint account, balancing the bank statements, and paying the bills in general. Jimmy acknowledged that he freely moved money in and out of accounts and that he transferred personal balances to Christy's credit card.

Christy also testified that her co-workers assumed she was married because she wore a wedding ring and "conducted [her]self as a married woman." She stated that she and Jimmy attended company parties every year together, and Jimmy confirmed going to parties with Christy. When asked whether Jimmy identified her as his wife, Christy answered: "over four and-a-half years, I'm sure he said it more than once. Can I tell you exactly when? No, I cannot."

Teri testified that Jimmy was her stepfather and that he was introduced as her stepfather "any time" there was a school event. Teri testified that Jimmy was introduced as her stepfather to her three band directors, her basketball coach, teachers, and friends' parents. He never said he was not Teri's stepfather and never objected to being called Teri's stepfather; he even personally introduced himself as her stepfather to her band director. According to Teri, Jimmy volunteered as her stepfather to be the liaison between Exxon and her school band for fundraising purposes.

Christy's mother, Audrey, testified that the family accepted and assumed the parties were married; Audrey believed Jimmy and Christy were married because they bought a home together, had a joint bank account, and took trips together. Audrey confirmed sending a birthday card to Jimmy as her "son-in-law." Audrey stated that Jimmy never told her he was not her son-in-law.

Christy's father, Ronald, also considered the parties to be married. He recalled that Christy showed off her wedding ring to her family at a Thanksgiving gathering in 2005. Ronald stated that the family was excited and congratulated Jimmy and Christy. Ronald also testified that he heard Jimmy introduce himself as Teri and Taylor's stepfather at a school event.

16

Christy's friend and former co-worker, Rachael, testified that Christy introduced Jimmy as her husband at a company Christmas party and that Jimmy did not object to this introduction. The parties' neighbor, Joshua, testified that Jimmy introduced himself in 2006 and told Joshua that he lived next door with "his wife, Christy" and "the kids." Joshua also testified that Jimmy's son Bryant told him that the parties had been married for "about a year and-a-half."

Turning to the contrary evidence, Bryant denied ever telling Joshua that Christy and Jimmy were married. Bryant testified that he never observed Jimmy holding Christy out as his wife or introducing her as his wife. Bryant testified that Christy personally told him in 2006 that they would not get married because Ashley was receiving financial aid and federal grants to go to school.

Ashley's financial aid application was admitted into evidence; it reflects Christy's marital status as "Divorced/Separated." The application also contained a blank box with regard to any information relating to a stepfather. Jimmy claimed that Christy had filled out Ashley's application; Christy claimed that Ashley filled out the application by herself.

Jimmy testified that he never agreed to be married. He testified that he never claimed Christy was his wife on any work-related document and that his son was his designated beneficiary. Jimmy also testified that he never claimed Christy as a spouse on his tax returns, but instead filed tax returns as "single" because he was not married. Jimmy also claimed that he filed Christy's tax returns as "single" at her direction "with her sitting there at all times." Christy denied being present when Jimmy filled out the tax returns and stated that Jimmy was in charge of filing them. She stated that she never signed any of the tax returns Jimmy prepared.

Christy acknowledged that the deed to the Black Cherry Lane house was only in Jimmy's name. However, she testified that she questioned Jimmy as to why her name was not included on any documents when they had both signed the home purchase contract. She testified that Jimmy told her to "Hush, hush, we'll talk about it later. . . .

17

Don't worry, it's 50/50" because "we were married." She also testified that Jimmy explained that her name was not included on the paperwork because her unfavorable credit score would have increased the interest rate by a quarter percent.

Christy further acknowledged that, when she bought the home from Jimmy in April 2009, the deed reflected that she and Jimmy were both "single." However, she also testified that she did not read the deed before signing it and would have signed "anything that day" to keep her kids in the home.

Jimmy admitted providing car insurance for his son as well as for Christy and her twin daughters. He denied providing any other insurance for Christy or her family. However, Christy testified that he paid for her health insurance one year when she missed her enrollment date. A check from Jimmy payable to ERS was introduced into evidence to support Christy's assertion.

Although several documents reflect the parties' marital status as "single," the representations in these documents go to the weight of the evidence; they do not necessarily negate a marriage. *See Quinn*, 2008 WL 1828327, at *5 (concluding that keeping separate bank accounts and filing tax returns as single persons did not negate existence of informal marriage but went to the weight of the evidence); *In re Giessel*, 734 S.W.2d at 31 (concluding that proponent spouse's denial of marriage in tax returns, social security, driver's license, bank, and pay records did not negate existence of informal marriage but went to the weight of the evidence).

Having reviewed the record before us, we conclude that the evidence is legally sufficient to support the trial court's finding that Jimmy and Christy represented themselves to others as married in the state of Texas. Although the evidence in this case is conflicting, it turns on the witnesses' credibility and demeanor. Therefore, it was within the factfinder's province to resolve and determine whether the parties represented themselves to others as married. We cannot say the evidence of presenting to others as married in the state of Texas is so weak as to render the trial court's finding clearly wrong and manifestly unjust.

18

Accordingly, we overrule Jimmy's second issue.

## II.    Property Division

In his third issue, Jimmy contends that the "trial court abused its discretion in dividing [his] retirement account because the parties were not married" as he argued in issues one and two and the trial court thus had no authority to characterize the parties' property as community property and divide it.  Alternatively, Jimmy contends that "the evidence conflicted regarding the date of the 'marriage.'  It was as early as the summer of 2005 or as late as the alleged holding out to the next-door neighbor, which occurred after they moved into the house in April 2006."  Therefore, Jimmy argues that "[s]hould this court find there was a common law marriage, but it occurred after September 20, 2005, the property division should be reversed and remanded for a new division as of the later date."

We already have concluded in issues one and two that legally and factually sufficient evidence supports a finding that Jimmy and Christy were informally married. Further, Jimmy does not argue that the evidence is legally and factually insufficient to support a finding that the parties were informally married on September 20, 2005. Rather, Jimmy argues that "the evidence conflicted regarding the date of the 'marriage.'" It is well established that in a bench trial the trial court is the sole judge of the credibility of the witnesses, assigns the weight to be given their testimony, may accept or reject all or any part of their testimony, and resolves any conflicts or inconsistencies in the testimony. *Bush*, 336 S.W.3d at 730.  It was within the province of the trial court to resolve any conflict in the evidence "regarding the date of the 'marriage.'" *See City of Keller*, 168 S.W.3d at 820.

Accordingly, we overrule Jimmy's third issue.

19

## Conclusion

We affirm the trial court's judgment.

/s/      William J. Boyce
             Justice

Panel consists of Justices Seymore and Boyce and Senior Justice Yates.[5]

---

[5] Senior Justice Leslie Brock Yates sitting by assignment.