**Reversed and Remanded and Opinion filed October 20, 2011**



In The

# Fourteenth Court of Appeals

---

### NO. 14-09-01080-CV

---

## JOHN W. SMALL, AISKEL ALVAREZ SMALL, ROBERT ALAN "BOB" SMALL, SMALL INTERESTS, LTD., STAR INSTRUMENTS, INC. AND SMALL FAMILY INTERESTS, INC., Appellants

### V.

## MURRIAH S. MCMASTER, Appellee

---

**On Appeal from the County Court at Law No. 1**
**Galveston County, Texas**
**Trial Court Cause No. 04FD2562**

---

## OPINION

Appellee Murriah McMaster brought suit to establish an informal or common-law marriage to appellant John W. "Jack" Small, and for a divorce and property division. The informal marriage and property issues were bifurcated and tried separately. After the first jury trial, the trial court signed an interlocutory judgment establishing an informal marriage between Murriah and Jack beginning on December 25, 1991. Murriah then added several third parties, including Jack's son, Robert A. Small (Bob), Jack's current wife, Aiskel Alvarez Small, and several business entities allegedly owned or controlled

by the Smalls. Murriah claimed, among other things, that Jack committed fraud and the third parties conspired with him to deprive the community estate of assets. She also alleged that Jack fraudulently transferred to one of the third parties a property in Galveston known as the "Gingerbread House" where Murriah operated an antique business. A separate jury considered the issues of divorce and property division. That jury answered favorably to Murriah, and the trial court rendered a final judgment on the verdict. Jack, Bob, and Aiskel appeal the trial court's judgment, as do Small Interests, Ltd., Small Family Interests, Inc., and Star Instruments, Inc. Because we conclude the evidence is factually insufficient to support the finding of an informal marriage, we reverse and remand, and we do not reach the appellants' issues relating to the property division.

I

In his first issue, Jack contends the evidence is legally and factually insufficient to support the trial court's judgment that Murriah was informally married to Jack. Bob and Aiskel join this issue, and rely on Jack's brief on this issue. In response, Murriah contends the appellants merely argue that Jack's witnesses were more credible than hers, and this court must defer to the jury's credibility determinations. Moreover, Murriah contends, sufficient evidence supports the judgment.

An informal or common-law marriage exists in Texas if the parties (1) agreed to be married, (2) lived together in Texas as husband and wife after the agreement, and (3) there presented to others that they were married.[1] *See* Tex. Fam. Code § 2.401(a)(2);

---

[1] Consistent with the statutory requirements, the jury was instructed that a man and a woman are informally married if "(1) they agreed to be married; and (2) after the agreement they lived together in Texas as husband and wife and (3) there presented to others that they were married." The jury was also instructed, in determining whether Murriah and Jack were married, that "[t]here is nothing inconsistent between an agreement to enter into a common[-]law marriage and an intention to have a ceremonial marriage at a future date." On appeal, Jack complains of numerous charge errors, but he failed to object below to the charge on the grounds he urges on appeal. We therefore review the sufficiency of the evidence against the charge as submitted, not against some other legal standard. *See Osterberg v. Peca*,

2

*Mills v. Mest*, 94 S.W.3d 72, 73 (Tex. App.—Houston [14th Dist.] 2002, pet. denied). The existence of an informal marriage is a fact question, and the party seeking to establish existence of the marriage bears the burden of proving the three elements by a preponderance of the evidence. *Weaver v. State,* 855 S.W.2d 116, 120 (Tex. App.— Houston [14th Dist.] 1993, no pet.). An informal marriage does not exist until the concurrence of all three elements. *Eris v. Phares*, 39 S.W.3d 708, 713 (Tex. App.— Houston [1st Dist.] 2001, pet. denied) (citing *Winfield v. Renfro,* 821 S.W.2d 640, 645 (Tex. App.—Houston [1st Dist.] 1991, writ denied)).

The appellants challenge the sufficiency of the evidence establishing each element; therefore, we will address each element in turn.

## A. Standards of Review

In conducting a legal-sufficiency review, we consider whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex. 2005). We credit favorable evidence if a reasonable fact-finder could, and disregard contrary evidence unless a reasonable fact-finder could not. *Id.* We review the evidence in the light most favorable to the verdict and indulge every reasonable inference that supports it. *Id.* at 822.

In contrast, when conducting a factual-sufficiency review, we consider all the evidence in the record, both supporting and conflicting. *Plas-Tex Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex. 1989). We set aside the verdict only if it is so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex. 1986). The jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony.

---

12 S.W.3d 31, 55 (Tex. 2000) ("[I]t is the court's charge, not some other unidentified law, that measures the sufficiency of the evidence when the opposing party fails to object to the charge.").

*Winfield,* 821 S.W.2d at 645. *Winfield v. Renfro*, 821 S.W.2d 640, 645 (Tex. App.—Houston [1st Dist.] 1991, writ denied).

### B. Agreement to be Married

To establish an agreement to be married, "the evidence must show the parties intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife." *Eris,* 39 S.W.3d at 714; *Winfield*, 821 S.W.2d at 645. A proponent may prove an agreement to be married by direct or circumstantial evidence. *Russell v. Russell,* 865 S.W.2d 929, 933 (Tex. 1993). The testimony of one of the parties to the marriage constitutes some direct evidence that the parties agreed to be married. *Eris,* 39 S.W.3d at 714.

The appellants contend that there is no credible evidence that an agreement to be married ever existed. We disagree.

Murriah and Jack met on Christmas Day, December 25, 1990. Shortly after that, they began dating. Murriah testified that one year after they met, on December 25, 1991, she and Jack agreed to be married. According to Murriah, she and Jack celebrated Christmas with their adult children that day at the home they shared in League City. They exchanged gifts, and Murriah gave Jack a ring she had custom-made for him as a wedding band. After their families left, Murriah testified, Jack suggested they have a private "ceremony" and exchange rings. According to Murriah, Jack promised that he would wear her ring and regard himself as her husband until they were married in a church. This testimony is some direct evidence of an agreement to be married. *See Eris,* 39 S.W.3d at 714.

Additionally, other witnesses testified that they were told of the ceremony., A former housekeeper, Mary Mazzola, testified that Jack told her about the marriage ceremony. Juana Fitzpatrick, a good friend of Murriah's, testified that Murriah told her that she and Jack had "committed to each other" and exchanged rings. Metta Foster, another friend of Murriah's, testified that Jack and Murriah told her they had a "private

ceremony" in which they agreed to be married, and she saw their wedding rings. Ronald McMaster, Murriah's son, testified that he once asked Jack when he was going to marry his mother, and Jack said he had already married Murriah in "their own ceremony." This evidence, along with Murriah's testimony, constitutes legally sufficient evidence of an agreement to be married.

Turning to the contrary evidence, Jack testified that he was never Murriah's husband and never referred to himself as such, and he denied that he and Murriah had a private ceremony in 1991 in which they agreed to be married. Jack also testified that the ring Murriah gave him was a Christmas gift, not a wedding ring, but he admits he wore it for many years. Jack denied he told Ronald McMaster that there had been a wedding ceremony. Jack also points to a 1994 Christmas card in which Murriah wrote "before this life is over, I hope you'll ask me to be your wife." That same year, Murriah wrote Jack a letter about another woman, stating "Why don't you give up and marry her? . . . You have ten days to give me an answer. I want to marry you and stop the bullshit." Jack asserts that these statements show Murriah did not believe that she was married to Jack. When questioned about these statements, however, Murriah testified that she was not giving Jack a deadline to marry her, but to "get married in a church and do it the right way with all of our family" and that Jack knew what she meant.

Although the evidence is conflicting, it turns on the witnesses' credibility and demeanor, and therefore was within the jury's purview to resolve. We cannot say the evidence of an agreement to be married is so weak as to be clearly wrong and manifestly unjust.

## C. Living Together as Husband and Wife

Jack concedes "there is no question regarding living together at various times from 1991 through 1997," but argues the evidence is legally and factually insufficient that he and Murriah lived together as man and wife, "especially since there was no agreement to

be married." Cohabitation need not be continuous for a couple to enter into a common-law marriage. *See Bolash v. Heid*, 733 S.W.2d 698, 699 (Tex. App.—San Antonio 1987, no writ). Because the appellants concede Jack and Murriah lived together during the relevant time and because we have already determined the evidence is legally and factually sufficient to show an agreement to be married, we hold that the evidence is legally and factually sufficient to support the element of living together as husband and wife.

But an agreement to be married and cohabitation are not enough to prove an informal marriage. "The cohabitation must be professedly as husband and wife, and public, so that, by their conduct towards each other, they may be known as husband and wife." *Grigsby v. Reib*, 153 S.W. 1124, 1130 (Tex. 1913). Thus we come to the third element of informal marriage—"presenting to others." *See In re Estate of Giessel*, 734 S.W.2d 27, 31 (Tex. App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.) (citing *Grigsby* for the notion that reputation in the community as living together as husband and wife is relevant in proving holding-out element).

### D. Presenting to Others

The statutory requirement of "presenting to others" is synonymous with the judicial requirement of "holding out to the public." *Lee v. Lee,* 981 S.W.2d 903, 906 (Tex. App.—Houston [1st Dist.] 1998, no pet.). "Holding out" may be established by the conduct and actions of the parties. *Id.* Occasional introductions as husband and wife are not sufficient to establish the element of holding out. *Id.* at 907; *Flores v. Flores*, 847 S.W.2d 648, 652, (Tex. App.—Waco 1993, writ denied); *see also Ex parte Threet,* 333 S.W.2d 361, 364 (Tex. 1960) (evidence that couple was introduced as husband and wife to a few friends was no evidence that they held themselves out as married).

Whether the evidence is sufficient to establish that a couple held themselves out as husband and wife turns on whether the couple had a reputation in the community for being married. *Eris,* 39 S.W.3d at 715; *see also Danna v. Danna*, No. 05-05-00472-CV,

2006 WL 785621, at *1 (Tex. App.—Dallas Mar. 29, 2006, no pet.) (mem. op.) (a "couple's reputation in the community as being married is a significant factor in determining the holding[-]out element"), *quoted in Smith v. Deneve*, 285 S.W.3d 904, 910 (Tex. App.—Dallas 2009, no pet.); *Giessel,* 734 S.W.2d at 31 (holding that couple held themselves out as married when they had reputation in community for being married even though they had kept marriage secret from a few family members). Proving a reputation for being married requires evidence that the couple "consistently conducted themselves as husband and wife in the public eye or that the community viewed them as married." *Danna*, 2006 WL 785621, at *2.

Murriah contends multiple witnesses, including members of her family, her friends, and acquaintances testified that she and Jack would introduce or refer to each other as "husband" and "wife" or that Murriah and Jack told others that they were married. There was also testimony that Jack would refer to Murriah as his wife, and that Murriah referred to herself as "Mrs. Small" in his presence and he did not object. All of these witnesses were Murriah's. Conversely, Jack denied that he was Murriah's husband or referred to himself as such. And he presented a number of witnesses, in addition to himself, who testified that Jack never told them he and Murriah were married, they never heard Jack or Murriah refer to themselves as husband or wife, and they never heard Murriah refer to herself as "Mrs. Small." These witnesses, similar to Murriah's, included Jack's family members, friends, and acquaintances.

Thus, the evidence concerning how Jack and Murriah represented themselves to family, friends, and acquaintances was conflicting, and the jury apparently found Murriah's witnesses to be more credible than Jack's. But, standing alone, occasional references to each other as "husband" and "wife" and the like are insufficient to establish an informal marriage. *See Eris*, 39 S.W.3d at 715; *Lee*, 981 S.W.2d at 907. Further, the element of presenting to others requires both parties to have represented themselves as married. *See* Tex. Fam Code § 2.401(a)(2). Here, all of the witnesses who testified to the representations were Murriah's; none of Jack's witnesses admitted to hearing Jack make

7

any such representations. And all of Murriah's evidence came from her personal circle of acquaintances whose testimony provides little, if any, indication of Jack and Murriah's reputation in the community. Moreover, there is no testimony that Jack and Murriah had a reputation in the wider community as being married; in other words, there was no proof that they "consistently conducted themselves as husband and wife in the public eye or that the community viewed them as married." *Danna*, 2006 WL 785621, at *2.

Indeed, Jack and Murriah's representations to the community tend to show they were *not* married. Although Murriah presented testimony that Jack would sometimes refer to Murriah as his wife to unidentified telephone callers at their home or to people in church, this testimony has little significance when compared to the overwhelming weight of the evidence of Murriah and Jack's other conduct and actions, all of which is contrary to a finding that Jack and Murriah held themselves out to the public as married. For example, Murriah admitted that she did not register for or receive wedding gifts, and she did not send any letters, emails, or announcements about being married. And, even though she and Jack would host large parties at their home in League City, they never threw a party to celebrate their marriage. Murriah did not change her last name to Small after the ceremony or establish any joint bank accounts with Jack. Murriah also admitted that she "probably" never told her neighbors who lived across the street from the League City house that she and Jack were married. And although Murriah testified that Jack took out a life-insurance policy and named her as the beneficiary, she acknowledged that she never had a copy of the policy. She also did not know if Jack ever changed his will to reflect that she was his wife. Murriah admitted that she has no documents in which she referred to Jack as her husband.

Murriah also admitted that she filed her federal income taxes as "single" every year since 1991. She likewise applied for auto insurance as "single" and acknowledged that if she applied for a credit card she would have represented on the application that she

8

was single.[2] She testified that she did so to comply with Jack's request that she never fill out any document as "married" because he was angry with the federal government and wanted to "get out of the system" to avoid paying taxes. In her brief, Murriah contends she credibly testified to facts showing that Jack wanted to "conceal the fact of his marriage, not to deny its existence." But even if that is true, a secret marriage cannot be an informal marriage. *See Lee*, 981 S.W.2d at 907; *Winfield*, 821 S.W.2d at 650. Further, even after Murriah filed this lawsuit to establish an informal marriage and for divorce, she continued to claim that she was "single" on her federal-income-tax form. She also never revealed to any of the certified public accountants she employed to prepare her returns that she was married.

Murriah also did not represent that she was married to Jack when an insurance-coverage dispute arose after she was hospitalized in 1992. The dispute arose at a time when Murriah apparently had insurance through one of the Small companies. In a 1993 letter she acknowledges signing, Murriah explained that her personal insurance carrier refused to honor the provider's claim, and that "Mr. Jack Small, [the] owner" of the company, had "interceded on [her] behalf" to help resolve the claim. She did not represent that she was Jack's spouse or had coverage as his spouse. Later, in 1994, a Swiss company, Zellweger Analytics, bought the company, and afterward refused to keep Murriah on its health-insurance plan unless Murriah qualified as Jack's dependent or spouse.[3] Jack, however, refused to represent that he was married to Murriah so that she could continue to have insurance coverage. After that, Murriah was no longer covered through the company.

---

[2] Additionally, Jack testified without contradiction that he never applied for credit cards or insurance as a married person.

[3] Murriah introduced three earnings statements from Zellweger created before the coverage dispute. These statements, from 1995 and 1996, reflect "taxable married status" as "Married," but they also reflect her address as the home she owned in Humble, not the League City home she shared with Jack.

Other major events in Jack's life also did not reflect Murriah was his spouse. When Jack's son Bob was married in 1992, not long after Murriah testified she and Jack were married, the wedding invitations did not name Murriah as Jack's spouse; instead, only the name "Jack Small" appears under the heading "Father of the Groom." The next year, Jack's other son, Bill, passed away. At the funeral service, Murriah did not sign the memorial book as one of the family members with Jack; instead, Murriah signed under the general "Relatives and Friends" section of the book.

Murriah's and Jack's personal relationships also were inconsistent with a finding of informal marriage. For example, Jack rekindled a relationship with a former girlfriend around 1994, and he also had a relationship with another woman in 1995. Before that, in 1993, Murriah dated a man named Pete Dunten, with whom she went on trips to Turkey and Baltimore. Even though Murriah and Dunten spent time together and were intimate, Murriah never told Duntan that she was married to Jack.

Finally, in 1998 Jack married Aiskel in Venezuela. Their marriage certificate was admitted into evidence.[4] Murriah was aware of Aiskel and Jack's marriage, and even though she testified that Aiskel had moved into the League City house where she used to live with Jack, she never attempted to file bigamy charges or otherwise claim that the marriage to Aiskel was invalid because Jack was already married to her.[5] In fact, in 1997 or 1998, Murriah had moved into the Gingerbread House where she operated her antique business. She did not file this lawsuit until September 2004, one month after the

---

[4] The act of one of the parties to an alleged common-law marriage in celebrating a ceremonial marriage with another person, without having first obtained a divorce, tends to discredit the first relationship and to show that it was not valid. *See Estate of Claveria v. Claveria*, 615 S.W.2d 164, 166 (Tex. 1981); *Flores*, 847 S.W.2d at 652.

[5] Murriah testified that she and Jack continued their relationship after Jack's marriage to Aiskel, and that Jack told Murriah the marriage was not permanent and to "bear with him." Murriah also testified that, since 1998, she had dated other men but did not tell any of them she was married to Jack.

10

purchaser of the Gingerbread House sought to evict her in August 2004.[6]  Murriah admitted that the eviction was the impetus for her lawsuit.

Thus, the evidence concerning "presenting to others" amounts to this:  (1) Murriah presented evidence, exclusively from her own witnesses, that she and Jack held out to some family, friends, and acquaintances that they were married; (2) Jack presented evidence, through his witnesses, that he never held out to others that he was married to Murriah; (3) there was no evidence showing the couple had a reputation in the broader community as a married couple; and (4) the overwhelming weight of the parties' other conduct and actions is contrary to Murriah's claim of an informal marriage.  We therefore sustain the appellants' factual-sufficiency challenge on the element of representing to others that they were married and conclude that the evidence is factually insufficient to support the judgment of an informal marriage.  *See Eris*, 39 S.W.3d at 716–17; *Winfield*, 821 S.W.2d at 651.

\* \* \*

We reverse the trial court's judgment and remand this case for a new trial.


/s/      Jeffrey V. Brown
         Justice


Panel consists of Justices Anderson, Brown, and Christopher.

---

[6] At trial, Murriah acknowledged that the Gingerbread House was originally purchased before her alleged marriage to Jack, but alleged that he had given it to her as a gift.