**Reversed and Remanded and Memorandum Opinion filed March 11, 2014.**



In The

# Fourteenth Court of Appeals

---

### NO. 14-13-00069-CV

---

## MURRIAH S. MCMASTER, Appellant

## V.

## JOHN W. SMALL, Appellee

---

**On Appeal from the County Court at Law No. 1
Galveston County, Texas
Trial Court Cause No. 04-FD-2562**

---

## M E M O R A N D U M   O P I N I O N

Murriah McMaster sued John "Jack" Small for divorce, alleging a common law marriage. A jury found in favor of McMaster, and Small appealed. *See Small v. McMaster*, 352 S.W.3d 280 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). Noting that Small had attacked the legal and factual sufficiency of the evidence to support the jury's verdict on every element of common law marriage, *id.* at 283, this court reversed and remanded for a new trial because the evidence

was factually insufficient to support the "holding out" element of a common law marriage, *id.* at 287–88.

On remand, Small filed a no-evidence motion for summary judgment on the element of holding out. McMaster responded with transcripts from the original trial and six affidavits. The trial court granted the motion, and McMaster appeals, contending there is more than a mere scintilla of evidence of the holding out element of a common law marriage.

We agree with McMaster, reverse the trial court's judgment, and remand for a new trial.

## I. STANDARD OF REVIEW

We review summary judgments de novo. *Raynor v. Moores Mach. Shop, LLC*, 359 S.W.3d 905, 907 (Tex. App.—Houston [14th Dist.] 2012, no pet.). We take as true all evidence favorable to the nonmovant, indulging reasonable inferences and resolving doubts in the nonmovant's favor. *Id.* "We sustain a no-evidence summary judgment when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Id.* at 907–08 (citing *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003)). There is more than a mere scintilla of evidence if reasonable and fair-minded people could differ in their conclusions. *Id.* at 908. The nonmovant is "'not required to marshal its proof; its response need only point out evidence that raises a fact issue on the challenged elements.'" *Hamilton v. Wilson*, 249 S.W.3d 425, 427 (Tex. 2008) (quoting Tex. R. Civ. P.

2

166a(i) cmt.—1997)). This is a legal sufficiency standard. *See King Ranch*, 118 S.W.3d at 750–51.[1]

## II.    ELEMENT OF HOLDING OUT

To prove an informal marriage, *i.e.*, a common law marriage, McMaster must prove that she and Small (1) agreed to be married; (2) lived together as husband and wife in Texas; and (3) in Texas, represented to others that they were married. *See* Tex. Fam. Code Ann. § 2.401(a)(2); *Small*, 352 S.W.3d at 283. The third element is also known as "holding out to the public." *Small*, 352 at 284–85.

"Holding out" may be shown by the conduct and actions of the parties. *Id.* at 285. "[S]poken words are not necessary to establish representation as husband and wife." *Riley v. Riley*, No. 14-11-00346-CV, 2012 WL 2550957, at *2 (Tex. App.—Houston [14th Dist.] July 3, 2012, no pet.) (mem. op.) (quotation omitted). The issue of whether a couple held themselves out as husband and wife "turns on whether the couple had a reputation in the community for being married." *Small*, 352 S.W.3d at 285. "Proving a reputation for being married requires evidence that the couple 'consistently conducted themselves as husband and wife in the public eye or that the community viewed them as married.'" *Id.* (quoting *Danna v. Danna*, No. 05–05–00472–CV, 2006 WL 785621, at *2 (Tex. App.—Dallas Mar. 29, 2006, no pet.) (mem. op.)). "Occasional introductions as husband and wife are not sufficient to establish the element of holding out." *Id.* This element "requires both parties to have represented themselves as married." *Id.*

---

[1] We note Small's heavy reliance on this court's prior determination that the earlier trial evidence was factually insufficient. However, a factual sufficiency standard, in contrast with the legal sufficiency standard we apply on this review of a summary judgment, requires reversal when the verdict is "so contrary to the overwhelming weight and preponderance of the evidence that it is clearly wrong and manifestly unjust." *Small*, 352 S.W.3d at 283 (citing *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986)). Evidence may be legally sufficient while factually insufficient. *See Redman Homes, Inc. v. Ivy*, 920 S.W.2d 664, 668 (Tex. 1996).

### III. MCMASTER'S SUMMARY JUDGMENT EVIDENCE

McMaster responded to Small's no-evidence motion for summary judgment and attached transcripts from the original trial and six affidavits. We now review some of the testimony concerning the holding out element.

McMaster testified by affidavit:

- "Jack and I enjoyed a reputation in the community, the public, and in the church as being married."

- "Jack would oftentimes accompany me to doctors, where he would introduce himself as my husband."

- "Even after Jack Small 'married' Aiskel Alvarez in 1999, he continued to introduce me to others as his wife."

McMaster also testified at trial:

- Small had asked McMaster to buy him a wedding ring and said he would wear it.

- Small had suggested the two have a private ceremony to exchange wedding rings.

- Small always wore his wedding ring.

- Small continued to introduce McMaster as his wife even after the marriage to Alvarez in 1999.

Mary Mazzola testified by affidavit that she worked five days per week as Small's and McMaster's housekeeper from 1991 until approximately 1997. She testified:

- "Throughout the years, I heard Jack Small refer to Murriah McMaster as his wife. He would introduce her as his 'wife,' and he also would refer to her as his 'wife,' both in public, at home, with family, at parties, and at church."

- "Jack and Murriah were known to their friends and the people of their church as husband and wife."

- "Jack Small personally told me about the private marriage ceremony that he had with Murriah McMaster in December of 1991."

- "I attended church services at Catholic Charismatic Center with Jack and Murriah. I often heard Jack introduce Murriah to others by saying 'this is my lovely wife.'"

Mazzola also testified at trial:

- Small referred to McMaster as his spouse or wife on many occasions; he also referred to McMaster as "Mrs. Small."

- Mazzola referred to McMaster as "Mrs. Small" in front of Small, and he never corrected her.

- Mazzola attended the same church as Small and McMaster, and Small always introduced McMaster, "This is my lovely wife."

- Small would say things such as "Talk to my wife about that," both on the phone and in person.

McMaster's son, Ronald, testified by affidavit that he had been in the presence of McMaster and Small on many occasions. He testified further:

- "I have on several occasions heard Jack Small refer to Murriah as his wife, and have heard Murriah refer to Jack as her husband."

- "One instance in particular occurred during May of 1992, when I attended a May Fest party at Jack and Murriah's residence. During this party, I overheard Jack introducing Murriah to other partygoers as his wife."

- "I overheard Jack on the telephone with what I believe was the Orkin Company. He told the person on the phone that they would 'have to get with [his] wife on that.'"[2]

- "I asked [Small] about his wedding to Murriah, and he told me that they had had a ceremony, and that they had gotten married."

- "Murriah and Jack held themselves out to others as husband and wife, and I perceived them to be husband and wife. I also witnessed them present themselves to others in the public, family and friends as husband and wife. They were known to be married by the public, family and friends."

---

[2] Alteration in the original.

Ronald testified at trial:

- Ronald observed Small and McMaster exchange rings in December 1991.

- Ronald heard Small refer to himself as McMaster's husband on several occasions.

- Small told Ronald that Small and McMaster were married and had a ceremony.

- At a party in May 1992 with about 500 people, the couple introduced themselves to others as husband and wife.

Natalie Nielson testified by affidavit that she was in a relationship with McMaster's son, she knew Small, and she lived with McMaster and Small while Nielson was pregnant. She testified further:

- "The first time that I met them [in 1995], we went to Murriah and Jack's home. Murriah answered the door, introduced herself to me, then introduced Jack as her husband. Jack did not make any statement to the contrary."

- "Over the following years, there were several occasions on which Murriah referred to herself as 'Mrs. Small.' There were also several occasions on which Jack would refer to Murriah as his wife."

- "I overheard Jack on the phone with someone, and he stated that the person on the phone would need to 'speak with [his] wife' about something."[3]

- "[Small] would say things like 'I'm going to let my wife handle that.'"

Nielson also testified at trial:

- Nielson went to Small's and McMaster's house many times between 1995 and 1998.

- McMaster referred to herself as "Mrs. Small," and Small never corrected her.

---

[3] Alteration in the original.

6

- Small wore a wedding ring on many occasions.

- When talking on the phone, Small would refer to McMaster and say things such as, "You need to speak to my wife about that."

- When referring to household chores and decorating that were McMaster's responsibilities, Small would say things such as, "I'm going to let my wife handle that."

Wanda Caraway testified by affidavit that she knew McMaster since 1986 and met Small in 1991. She testified further:

- "I have been at church with Jack and Murriah several times. Jack always introduced Murriah as his wife. They had a reputation in the church as being husband and wife, and people in the church knew them as husband and wife."

- "In 1993, . . . [Small] told me that he was very much in love with her as his wife."

- "I have been at several parties with Murriah and Jack, where Jack has introduced Murriah as his wife, and Murriah has introduced Jack as her husband."

Caraway testified at trial:

- Caraway accompanied McMaster to the jewelry store where McMaster bought a wedding ring for Small.

- She heard Small introduce McMaster at church as his wife "many times."

Juan Fitzpatrick testified by affidavit that she knew Small and McMaster and:

- "I inquired about Jack and Murriah's rings, and Murriah told me that she and Jack had a ceremony and they had exchanged rings."

- "When I visited their church, I witnessed that the people of the church perceived them to be husband and wife."

- "Based on their holding themselves out and indicating to me that they were husband and wife, I believed them to be husband and wife."

Fitzpatrick also testified at trial:

7

- Small wore a wedding ring on his left hand ring finger; McMaster had told Fitzpatrick that she and Small had a marriage ceremony and gave rings to one another.

Metta Marie Martin Foster testified for McMaster at trial:

- Small wore a wedding ring.
- McMaster and Small told Foster that the couple had a private wedding ceremony.

Emilio Durant did carpentry and painting work for McMaster and Small, and he testified for McMaster at trial:

- Small made statements to Durant such as "Go ask my wife."
- When Durant wanted to be paid, Small told him, "Ask my wife how many hours you have and she's going to pay you."

## IV. ANALYSIS

After reviewing the evidence detailed above, we hold that McMaster adduced more than a mere scintilla of evidence on the holding out element of a common law marriage. *See Riley v. Riley*, No. 14-11-00346-CV, 2012 WL 2550957, at *3 (Tex. App.—Houston [14th Dist.] July 3, 2012, no pet.) (mem. op.) (reversing the trial court's no-evidence summary judgment based solely on the affidavit of the proponent spouse, husband, who testified that the couple often referred to each other publicly as husband and wife; the husband always introduced the wife as his wife, and she never objected; the wife publicly wore a wedding ring for many years; they registered at a hotel one time as husband and wife; and they comingled some of their financials); *Martinez v. Lopez*, No. 01-09-00951-CV, 2011 WL 2112806, at *5 (Tex. App.—Houston [1st Dist.] May 26, 2011, no pet.) (mem. op.) (evidence of holding out was legally sufficient based solely on the proponent spouse's testimony; she testified that she introduced the protesting spouse as her husband and that the protesting spouse represented to all of their

friends and family that they were married); *Barbee v. Barbee*, No. 12-09-00151-CV, 2010 WL 4132766, at *3–4 (Tex. App.—Tyler Oct. 20, 2010, no pet.) (mem. op.) (evidence of holding out was legally sufficient when the proponent of the marriage, wife, testified she represented to everyone that she was married to the husband, and the husband did not deny it; one of the husband's girlfriends testified that the husband told her he was married; the wife's father testified that the husband told the wife's father that the husband was married to the wife; the couple's pastor testified that the couple had a reputation in the church as being married; the couple's friend testified that the husband knew that the wife represented to others that they were married, and the couple was perceived in the community as being married); *Eris v. Phares*, 39 S.W.3d 708, 715 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) ("Here, several of Phares's friends and employees testified they thought the couple was married because they lived together and acted as if they were married. Phares also testified he introduced Eris as his wife and she never contradicted him. This is more than a scintilla of evidence that the two represented to others in Texas that they were married."); *Winfield v. Renfro*, 821 S.W.2d 640, 648 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (evidence of holding out was legally sufficient because the protesting spouse paid for a hotel in the name of "Mr. and Mrs.," and the proponent lived in a condominium that had the protesting spouse's last name on the mailbox, which the protesting spouse knew about but did not object); *see also, e.g.*, *Bailey v. Thompson*, No. 14-11-00499-CV, 2012 WL 4883219, at *10–12 (Tex. App.—Houston [14th Dist.] Oct. 16, 2012, no pet.) (mem. op.) (evidence of holding out was legally and factually sufficient when there was evidence that the parties wore wedding bands; the proponent spouse testified that the husband referred to her as his wife; the wife's daughter testified that the husband referred to himself as the child's stepfather to others in the community; the wife's mother sent a card to the

9

husband as her son-in-law, and he never said he was not her son-in-law; the wife's former co-worker testified that the wife introduced the husband as her husband, and he did not object; the parties' neighbor testified that the husband said he lived next door with his wife); *Quinn v. Milanizadeh*, No. 01-07-00489-CV, 2008 WL 1828327, at *6–7 (Tex. App.—Houston [1st Dist.] Apr. 24, 2008, no pet.) (mem. op.) (evidence of holding out was legally and factually sufficient when the proponent spouse, wife, testified that the husband referred to the wife as his wife to their friends and family; the wife's friend testified that the wife referred to the husband as her husband, and the husband never denied he was married to the wife; and the couple signed a home mortgage loan as husband and wife and were on the same health insurance for a period of time).

Small appears to complain on appeal that McMaster did not present any evidence of holding out occurring after 2005.[4] According to McMaster's third amended petition, however, she alleged that they "were married on December 25, 1991 and ceased to live together as husband and wife on or about August 6, 2004." Because there is no such thing as a common law divorce in Texas, a common law marriage, "like any other marriage, may be terminated only by death or a court decree." *Claveria's Estate v. Claveria*, 615 S.W.2d 164, 167 (Tex. 1981). Even the spouses' subsequent denials of the marriage do not undo the marriage. *Id.* Accordingly, McMaster had no burden to prove there was holding out in 2005 or afterward because she adduced some evidence of holding out at an earlier time.

---

[4] Small contends that McMaster offered no evidence of holding out "during the time period in question," complaining that McMaster's "re-dated affidavits and testimony from 2005, thinly disguised on its face as current," provided no evidence that "'holding out' has existed since 2005 or that even the parties of the affidavits have even been in the presence of Small, which none has since 2005." Small contends that he "objected to the affidavits as misrepresentations of current holding out." He concludes that the summary judgment was properly granted because there was no "genuine evidence whatsoever that McMaster and Small held themselves out to the community as 'married' during at least the last eight (8) years to the present."

McMaster's failure to adduce evidence of holding out after August 6, 2004, is not fatal to her claim that the parties were married before that date.

Accordingly, the trial court erred by signing a no-evidence summary judgment on McMaster's alleged common law marriage. McMaster's sole issue is sustained.

## V.    CONCLUSION

Having sustained McMaster's sole issue on appeal, we reverse the trial court's judgment and remand for a new trial.


/s/        Sharon McCally
           Justice

Panel consists of Justices McCally, Busby, and Donovan.