**Opinion issued December 23, 2025**



**In The**

# Court of Appeals

**For The**

# First District of Texas

_____

**NO. 01-24-00026-CV**

_____

## IN THE ESTATE OF BRYAN D. DAVIDSON, DECEASED

**On Appeal from the Probate Court**
**Galveston County, Texas**
**Trial Court Case No. PR-0081453**

## MEMORANDUM OPINION

The Dead Man's Statute took up residence in the state's lawbooks by 1871

and lived there for more than a century.[1] But its critics always outnumbered its fans.

---

1  *See Lewis v. Aylott's Heirs*, 45 Tex. 190, 200–01 (1876); *Garner v. Cleveland*, 35 Tex. 74, 76–77 (1872); Maurice Cheek, *Testimony as to Transactions with Decedents*, 5 TEX. L. REV. 149, 149 n.4 (1927).

Some said that the "time consumed in applying and interpreting the statute is out of all proportion to the doubtful good it does."[2] Others added that "at its best, the dead man's statute is full of snares, traps, and pitfalls."[3]

Although the Dead Man's Statute lost its lease in the Texas statute books more than 40 years ago, it has since taken up residence in one half of a rule of evidence. *See* TEX. R. EVID. 601(b). It arises here in the context of a dispute regarding the existence of an informal, or common-law, marriage. Both sides share the traditional understanding that the Dead Man's Rule can block testimony about an agreement to be married.[4] Does it block such testimony here?

The deceased is the late Bryan Davidson of Galveston County, who died at age 62 and left behind the following survivors:

- An ex-wife (Debbie Davidson),

- Three adult sons (appellants Garet Davidson, Jeffrey Davidson, and Kyle Davidson, collectively "Bryan's sons"), and

- Either a girlfriend or a wife (appellee Sherry Myers).

---

[2]     Cheek, 5 TEX. L. REV. at 172.

[3]     A. R. Stout, *Should the Dead Man's Statute Apply to Automobile Collisions?*, 38 TEX. L. REV. 14, 23 (1959).

[4]     *See Berger v. Kirby*, 105 Tex. 611, 615, 153 S.W. 1130, 1132 (1913); *Edelstein v. Brown*, 100 Tex. 403, 405, 100 S.W. 129, 129–30 (1907); *see also* Joseph W. McKnight, *Family Law: Husband and Wife*, 44 SW. L.J. 1, 2 (1990) ("If one of the parties is dead, the survivor will be required to meet the limitation imposed by Evidence Rule 601(b) by providing corroboration of an alleged transaction with the decedent.").

Sherry presented evidence that she and Bryan lived together and that they held themselves out as married. But did they in fact agree to be married? Bryan cannot answer the question because he has passed away, and Sherry might or might not be able to say, depending on whether the rule lets her.

The parties tried the issue of common-law marriage to the bench. Each side called witnesses, examined them, and presented the factfinder with evidence that would seemingly qualify as conflicting—were it not for the twist presented by the Dead Man's Rule. *See id.*

Sherry testified about what Bryan said about agreeing to be married. After Sherry rested her case-in-chief, Bryan's sons moved for directed verdict, arguing that the Dead Man's Rule barred the trial court from considering her testimony on this matter. The court denied the motion for directed verdict. When all the pertinent evidence had come in, the judge ruled that, though the evidence was conflicting, a preponderance favored Sherry's position that an informal marriage existed: "I think there is enough proof to show—more proof to show that there was a common-law marriage than not." The court declared that Sherry was Bryan's surviving spouse. Bryan's sons appeal and invoke Rule 601(b) in seeking reversal of the trial court's declaratory judgment.

We affirm.

**Background**

Application of the Dead Man's Rule requires a short review of the proceedings below. After Bryan's death, his sons found a copy of a 2002 will—executed when Bryan and Debbie were still married—and requested that the trial court admit it to probate. Sherry objected to their application, intervened in the case, and alleged that she had an informal marriage with Bryan. She further alleged that he had revoked the 2002 will and died before he could execute a new one. Sherry also filed a petition requesting declarations that she and Bryan had an informal marriage and that she was Bryan's surviving spouse.

The trial involved numerous witnesses, documents, and text messages. The parties clashed over each element of common-law marriage, and they clash over them again on appeal. We summarize the testimony presented on each of the elements. *See* TEX. FAM. CODE § 2.401(a)(2) (providing elements that party must prove to establish informal marriage).

**A.     Agreement to Be Married**

Sherry and Bryan began dating in 2001, while Bryan and Debbie were still married. Debbie was aware of Bryan and Sherry's relationship. Divorce proceedings between Bryan and Debbie began in 2012, and their divorce was finalized in 2014. Debbie and Bryan remained close after their divorce, but Debbie and Sherry did not get along.

The most cogent evidence relating to whether Bryan and Sherry agreed to be married came from Sherry herself:

Q. So let's kind of come forward to, you know, if we're admitting that we were not married from 2001 to 2012, or actually 2014 because he [Bryan] was still married, the divorce hadn't been finalized, when do you—when do you assert that things changed from being we're dating to being we're now a married couple?

A. 2014 we went up to Bobby's [Bryan's father], him and Karla [one of Bryan's sisters] had went over the jewelry together and everything. Then when we got home, it was September, that was our anniversary from the first real date or sexual encounter, two thousand—9/11. And so that was always our anniversary. So on that anniversary, after we had gotten back, that's when he and I had the conversation that we were—divorce is final, we're common law, we're together. And his exact words were, you f*** around on me, I'll kill you. And I said to him, if you f*** around on me, I'll kill you, too. And we laughed like we were exclusive. Then in 2015 I had already gotten the ring, his momma's ring, and then that's when it was the first time, like we'd kind of told I think like Sheryl [Guss, a friend of the Davidson family] and them, like it's official, but we already lived as common law from the moment he gave me the ring.

Q. Okay. So—so in terms of the agreement between the two of you that you were married goes back to September of 2014?

A. Yes.

Sherry and Bryan began to let people know about their marriage, but they did not "publicize" the change in their relationship to Debbie, who would occasionally send text messages to Bryan with rude comments about Sherry.

In August 2017, Hurricane Harvey hit the greater Houston area and caused widespread destruction, including on the land in Santa Fe where Bryan and Sherry

lived. They could not remain on the property in the aftermath of the storm. They were also unable to find a place to live together during the cleanup. Bryan moved back in with Debbie. Sherry, her adult daughter, and her granddaughter moved in with Sherry's mother. Bryan and Sherry lived apart from August 2017 until January 2019, when they were able to move back onto their property.

Even though Bryan and Sherry did not live together for approximately sixteen months after Hurricane Harvey, they did not break up. They purchased a car together in 2018. In connection with this purchase, they applied for life insurance. When asked who they wanted to be covered by life insurance, they selected the "Both borrowers (joint)" option, an option that was "[a]vailable for spouses and business partners only."

Sherry's counsel asked her the following series of questions:

Q.    Do you feel like y'all broke up in 2017?

A.    No.

Q.    Okay. Do you feel like prior to 2017 that you all had an agreement that you were married?

A.    Yes.

. . . .

Q.    Okay. So even if somehow that [representations to others in the community and family members that they were married] doesn't qualify, then in 2018 we have a document where he says that y'all are borrowing as husband and wife, correct?

A.    Yes.

6

Q. And into 2018, 2019, 2020, '21 were you still representing to people that y'all were married?

A. Yes.

Q. Did you still have an agreement between the two of you that you were husband and wife?

A. Yes.

Q. And starting January 31st, 2019, through the date of his death, were you living together?

A. Yes.

Nobody else offered any direct evidence on the element of agreement, and Sherry does not cite any in her brief.

## B. Living Together as Spouses

Family members—including Bryan's father, Sherry's father, and Sherry's children from a prior relationship—and other witnesses testified that Bryan and Sherry lived together. Sherry's father "knew that they were living as man and wife," and he considered Bryan to be his son-in-law. A witness who sold a boat to Bryan and Sherry stated, "Yeah, they lived together and I believe it was on property and they had—they had some cattle or some livestock." This witness further testified: "I think they considered themselves married is what I believe. They were both talking about it. They were married, they had a lot of dreams of what they wanted to do with their life."

Sherry also testified to this element directly, stating, "[W]e were living together as husband and wife, yes."

7

## C. Representing to Others That They Were Married

Sherry also presented considerable testimony indicating that she and Bryan held themselves out as married. Just as an example, Bryan's father testified that on several occasions, "I heard him call her little wife." He further stated that they held themselves out as husband and wife. He introduced them to others as his son and daughter-in-law, and neither Bryan nor Sherry corrected him and said that they were not married. He also stated that Sherry wore a wedding ring that Bryan had given her, and that ring had previously been Bryan's mother's wedding ring.

Sherry's father and daughter also heard Bryan refer to Sherry as his wife. Bryan once told Sherry's father that "you're my father-in-law." Similarly, Sherry's daughter considered Bryan to be her father, and he repeatedly introduced her as his daughter.

This element of informal marriage had support from another witness, Lynett Gace. She testified that Bryan and Sherry, her neighbors, "always" referred to each other as "my husband" or "my wife." Bryan's sisters Kerri and Karla offered similar testimony. Kerri considered Sherry to be her sister-in-law, rather than just a woman dating her brother. Karla, a wedding planner, testified that Bryan and Sherry's plans to have a formal wedding ceremony were "on hold" due to Bryan's health problems. She stated, "They were already married in their eyes, and they were going to have a celebration once he got his heart [transplant]."

**D.     Conflicting Evidence**

Bryan's sons presented evidence contesting each element.

Their evidence included documents, such as Bryan's 2020 Social Security Benefit Statement and his 2021 car insurance card, that did not name Sherry or reflect that she was Bryan's wife. Bryan's calendar for 2020 did not include a notation for a wedding anniversary. Additionally, in January 2020, Bryan updated his financial account with Ameriprise Financial Services to list both Debbie and Sherry as equal beneficiaries. Under "Relationship," he named Debbie as "Ex Wife" and Sherry as "Girlfriend." Six months later, in July 2020, Bryan updated the beneficiary designations again to give Debbie a 20% share and Sherry an 80% share. The designation continued to list Sherry as "Girlfriend."

Longtime friends of Bryan's, a second cousin, and Debbie all testified that they never heard Bryan refer to Sherry as his wife. Bryan's cousin never saw him wearing a wedding ring from Sherry, and she never saw Sherry wearing a wedding ring from Bryan. Additionally, Bryan and Debbie exchanged text messages in November 2020, approximately two months before Bryan's death. During this conversation, Debbie referenced another family member's social media post and asked, "Aunt [S]herry??? So are y'all married??" Bryan responded, "Hell no. Take a break Debbie damn."

One of Bryan's friends testified that he believed Sherry "was living with her daughter or her mother" prior to Hurricane Harvey. Although she spent nights with Bryan, she had her own home, and they were not living together. This friend did not believe that Bryan and Sherry were living together "because [he] had heard several times, I don't want to be caught out here, you know. . . . [b]y the boys or Debbie or anybody that would come out there." He testified that Bryan and Sherry broke up after Hurricane Harvey, and Bryan moved back in with Debbie and tried to reconcile. Debbie also testified that she and Bryan attempted to reconcile during this period, and she also believed that Sherry was living with her mother and not with Bryan during the entirety of their relationship.

At the close of testimony on this issue, the trial court stated that "there is enough proof to show—more proof to show that there was a common law marriage than not." In a written judgment, the court found "that there is sufficient evidence to establish that an informal marriage existed between Sherry Myers and Bryan D. Davidson." The court granted Sherry's petition for declaratory judgment and decreed that "Sherry Myers is the surviving spouse of Bryan D. Davidson."[5]

_____

[5] On the second day of trial, the trial court heard evidence relating to whether Bryan's 2002 will should be admitted to probate or whether he had revoked that will after his divorce. In its written judgment, the court found "that there is insufficient evidence to overcome the presumption that Bryan D. Davidson revoked his original Last Will and Testament." The court denied the application to probate the 2002 will submitted by Bryan's sons, refused to admit that will to probate, and ordered that Bryan's "legal heirs must be determined through an heirship proceeding." Bryan's

**Informal Marriage and the Dead Man's Rule**

Bryan's sons raise two related issues on appeal: (1) the trial court's finding that an informal marriage existed between Bryan and Sherry was against the great weight and preponderance of the evidence such that the finding was clearly wrong and manifestly unjust; and (2) the court abused its discretion by denying their motion for directed verdict because Sherry presented no evidence—specifically, no evidence that was not barred by the Dead Man's Rule—that an express agreement to be married existed between her and Bryan. Bryan's sons challenge the sufficiency of the evidence supporting each of the three elements of informal marriage.

## A.     Standard of Review and Governing Law

A trial court's finding that an informal marriage exists is subject to legal and factual sufficiency review on appeal. *Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993); *Nguyen v. Nguyen*, 355 S.W.3d 82, 87–88 (Tex. App.—Houston [1st Dist.] 2011, pet. denied). We apply the usual standards of review when considering whether legally and factually sufficient evidence supports a trial court's finding following a bench trial. *See City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005) (stating that "[t]he final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict

---

sons do not challenge the portion of the trial court's judgment concerning the will on appeal.

11

under review" and that we must credit favorable evidence if reasonable jurors could and disregard contrary evidence unless reasonable jurors could not); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam) (stating that in factual sufficiency review, we must consider all evidence and should set aside verdict "only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust").

When a trial court's denial of a directed verdict is based on the evidence, we apply a legal sufficiency or "no evidence" standard of review. *Austin Bridge & Rd., LP v. Suarez*, 556 S.W.3d 363, 376 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). "A directed verdict is proper only under limited circumstances, such as when there is no evidence of an essential element of a claim or defense, or when the evidence conclusively establishes the right of the movant to judgment or negates the right of the opponent." *Id.*

A party must prove three elements to establish a valid informal marriage: (1) the parties agreed to be married; (2) after the agreement, the parties lived together in Texas as spouses; and (3) the parties represented to others in Texas that they were married. TEX. FAM. CODE § 2.401(a)(2); *Nguyen*, 355 S.W.3d at 88. An informal marriage does not exist until the concurrence of all three elements. *Nguyen*, 355 S.W.3d at 88; *Eris v. Phares*, 39 S.W.3d 708, 713 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). The party seeking to establish the existence of the marriage bears

the burden to establish these elements by a preponderance of the evidence. *Nguyen*, 355 S.W.3d at 88.

To establish an agreement to be married, the evidence must show that the parties intended to have "a present, immediate, and permanent marital relationship and that they did in fact agree to be" spouses. *Eris*, 39 S.W.3d at 714. A proponent of an informal marriage may prove an agreement to be married by direct or circumstantial evidence. *Small v. McMaster*, 352 S.W.3d 280, 283 (Tex. App.—Houston [14th Dist.] 2011, pet. denied); *see Russell*, 865 S.W.2d at 933 ("Proof of an agreement to be married may be made by circumstantial evidence or conduct of the parties."). "The testimony of one of the parties to the marriage constitutes some direct evidence that the parties agreed to be married." *Small*, 352 S.W.3d at 283. A factfinder may infer an agreement to be married "from cohabitation and representations." *Eris*, 39 S.W.3d at 714.

With respect to the second element, living together as spouses, "[c]ohabitation need not be continuous for a couple to enter into a common-law marriage." *Small*, 352 S.W.3d at 284.

The third element, representing to others, is "synonymous with the judicial requirement of 'holding out to the public.'" *Eris*, 39 S.W.3d at 714–15 (quoting *Winfield v. Renfro*, 821 S.W.2d 640, 648 (Tex. App.—Houston [1st Dist.] 1991, writ denied)). This element may be established by the conduct and actions of the parties.

*Small*, 352 S.W.3d at 285; *Eris*, 39 S.W.3d at 715 ("Spoken words are not necessary to establish representation as husband and wife."). However, occasional introductions as spouses are not sufficient to establish this element. *Small*, 352 S.W.3d at 285. "Whether the evidence is sufficient to establish that a couple held themselves out as husband and wife turns on whether the couple had a reputation in the community for being married." *Id.* Proving a reputation for being married requires evidence that the couple "consistently conducted themselves" as spouses "in the public eye or that the community viewed them as married." *Id.* (quotation omitted).

**B.    Sufficiency of Evidence to Support Each Element of Informal Marriage**

**1.    Living together as spouses and holding out as married**

We first address whether Sherry presented legally and factually sufficient evidence that she and Bryan lived together as spouses and represented to others that they were married.

The evidence on both elements was conflicting at trial. With respect to the second element of informal marriage—living together in Texas as spouses—Sherry directly testified that she and Bryan "were living together as husband and wife." Family members—including Bryan's father, Sherry's father, and Sherry's adult children—testified that they lived together, with Bryan's father specifying that they began living together in 2014 and Sherry's daughter stating that they started living

14

together in 2012 or 2014. A witness who sold a boat to Bryan and Sherry testified that they lived together, and this witness believed that "they considered themselves married." Bryan's sons, on the other hand, presented witnesses who testified to the contrary, including Debbie and a friend of Bryan's, both of whom testified that they believed Sherry lived with her mother but sometimes stayed overnight with Bryan.[6]

The evidence on the third element—representing to others in Texas that they were married—is similarly conflicting. Bryan's father, Sherry's father, Sherry's daughter, Bryan's sisters, and Sherry and Bryan's neighbor all testified that they heard Sherry and Bryan refer to each other as husband and wife on multiple occasions. Bryan's father introduced Bryan and Sherry as his son and daughter-in-law, and neither of them corrected him and said that they were not married. Sherry's daughter testified that Bryan introduced her as his daughter, and one of Bryan's sisters considered Sherry to be her sister-in-law. Bryan also gave Sherry a ring, which had been his mother's wedding ring.

---

[6] It is undisputed that Sherry and Bryan lived apart for approximately sixteen months following Hurricane Harvey in August 2017. Sherry lived with her mother, while Bryan lived with Debbie. However, "[c]ohabitation need not be continuous for a couple to enter into a common-law marriage." *Small v. McMaster*, 352 S.W.3d 280, 284 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). Sherry unequivocally testified that she and Bryan lived together as spouses from 2014 until Hurricane Harvey, and they lived together again from January 2019 until Bryan's death in January 2021.

Bryan's sons called witnesses—including a cousin, family friends, and Debbie—who testified that they never heard Bryan refer to Sherry as his wife. Bryan's cousin testified that neither Bryan nor Sherry wore a wedding ring. Additionally, Bryan's sons presented documentary evidence in which Bryan either did not list Sherry as his wife (a Social Security benefits statement, his car insurance cards) or expressly referred to her as his girlfriend (the Ameriprise beneficiary designation form).[7] They also presented a series of text messages between Bryan and Debbie, exchanged approximately two months before his death, in which Debbie asked if Bryan and Sherry were married, and he responded, "Hell no."[8]

As the factfinder in this bench trial, the trial court was the sole judge of the credibility of the witnesses and the weight to give their testimony. *See City of Keller*, 168 S.W.3d at 819; *McKeehan v. Wilmington Sav. Fund Soc'y, FSB*, 554 S.W.3d 692, 698 (Tex. App.—Houston [1st Dist.] 2018, no pet.). The trial court had to resolve conflicts in the evidence, and it could choose to believe one witness and disbelieve another. *See City of Keller*, 168 S.W.3d at 819; *McKeehan*, 554 S.W.3d

---

[7]     When asked about the beneficiary designation form, Sherry testified, "[I]n our eyes, we were married. But some places aren't going to accept that because it's not—we don't have a certificate."

[8]     Neither side asked Sherry about this series of text messages. However, she did testify that because she and Debbie had an acrimonious relationship and Debbie had a history of sending Bryan rude text messages about Sherry, she and Bryan deliberately did not publicize their marriage to Debbie.

at 698. We may not substitute our judgment for the factfinder's. *McKeehan*, 554 S.W.3d at 698; *see City of Keller*, 168 S.W.3d at 819 ("Reviewing courts cannot impose their own opinions to the contrary.").

The trial court heard evidence supporting Sherry's position that she and Bryan lived together as spouses and that they represented to others—on more than an occasional basis—that they were married. The court also heard evidence supporting the position of Bryan's sons that Bryan and Sherry did not live together and that they did not represent to others that they were married. The court resolved the conflict in the evidence in favor of Sherry's position. We conclude that the trial court's implied finding that Sherry established these two elements of informal marriage is not "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Cain*, 709 S.W.2d at 176; *Small*, 352 S.W.3d at 284–85.

## 2. Agreement to be married

Whether sufficient evidence supports the trial court's finding of an informal marriage therefore hinges on the evidence of the first element, an agreement to be married. This issue in turn comes down to the testimony of Sherry. Her account of the agreement to be married reduces to roughly three sentences:

> So on that anniversary, after we had gotten back, that's when he and I had the conversation that we were—divorce [to Debbie] is final, we're common law, we're together. And his exact words were, you f*** around on me, I'll kill you. And I said to him, if you f*** around on me, I'll kill you, too.

17

While these reciprocal promises may vary from the classic exchange of words like "*I will*," "*I do*," and "'*til death do us part*," they suffice to prove an agreement, as long as they can be considered. *See Eris*, 39 S.W.3d at 714 ("To establish this element of common-law marriage, the evidence must show the parties intended to have a present, immediate, and permanent marital relationship and that they did in fact agree to be husband and wife.").

The only legal barrier that could nullify this testimony would be the Dead Man's Rule. If the rule puts the testimony off-limits, that evidence amounts to no evidence at all. Whenever a rule of evidence bars the consideration of a piece of testimony, the testimony falls within the second of the four categories listed by Justice Calvert in his 1960 article on insufficiency of evidence:

> "No evidence" points must, and may only, be sustained when the record discloses one of the following situations: (a) a complete absence of evidence of a vital fact; (b) *the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact*; (c) the evidence offered to prove a vital fact is no more than a mere scintilla; (d) the evidence establishes conclusively the opposite of the vital fact.

Robert W. Calvert, *"No Evidence" and "Insufficient Evidence" Points of Error*, 38 TEX. L. REV. 361, 362–63 (1960) (emphasis added). As an example of a rule fitting within the second category, Justice Calvert listed the hearsay rule. *Id.* at 363.

The Dead Man's Rule generally bars certain kinds of testimony about a decedent's oral statement, but its general prohibition has an exception for cases with corroboration:

> (b) The "Dead Man's Rule."
>
> > (1) *Applicability*. The "Dead Man's Rule" applies only in a civil case:
> >
> > > (A) by or against a party in the party's capacity as an executor, administrator, or guardian; or
> > >
> > > (B) by or against a decedent's heirs or legal representatives and based in whole or in part on the decedent's oral statement.
> >
> > (2) *General Rule*. In cases described in subparagraph (b)(1)(A), a party may not testify against another party about an oral statement by the testator, intestate, or ward. In cases described in subparagraph (b)(1)(B), a party may not testify against another party about an oral statement by the decedent.
> >
> > (3) *Exceptions*. A party may testify against another party about an oral statement by the testator, intestate, ward, or decedent if:
> >
> > > (A) the party's testimony about the statement is corroborated; or
> > >
> > > (B) the opposing party calls the party to testify at the trial about the statement.

TEX. R. EVID. 601(b); *see Russell*, 865 S.W.2d at 933 ("If one of the parties [to an alleged informal marriage] is dead, the survivor will be required to meet the limitation imposed by Evidence Rule 601(b) by providing corroboration of an

19

alleged transaction with the decedent.") (quoting Joseph W. McKnight, *Family Law: Husband and Wife*, 44 Sw. L.J. 1, 2 (1990)).

Corroborating evidence "must tend to support some of the material allegations or issues that are raised by the pleadings and testified to by the witness whose evidence is sought to be corroborated." *Fraga v. Drake*, 276 S.W.3d 55, 61 (Tex. App.—El Paso 2008, no pet.). This evidence may come from any other competent witness or other legal source, including documentary evidence.[9] "Corroborating evidence need not be sufficient standing alone, but [it] must tend to confirm and strengthen the testimony of the witness and show the probability of its truth." *Bertucci v. Watkins*, 709 S.W.3d 534, 550 (Tex. 2025) (quotation omitted); *see also Corroborating Evidence*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Evidence that differs from but strengthens or confirms what other evidence shows (esp. that which needs support)."). "It is sufficient, for instance, if the corroborating evidence shows conduct on the part of the deceased which is generally consistent with the

---

[9]    *See Odom v. Coleman*, 615 S.W.3d 613, 631–32 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (holding that testimony from third party provides corroboration under Dead Man's Rule); *Quitta v. Fossati*, 808 S.W.2d 636, 640–41 (Tex. App.—Corpus Christi 1991, writ denied) (testimony from third party); *Powers v. McDaniel*, 785 S.W.2d 915, 920 (Tex. App.—San Antonio 1990, writ denied) (copies of checks and decedent's will carrying out terms of oral agreement); *Donaldson v. Taylor*, 713 S.W.2d 716, 717 (Tex. App.—Beaumont 1986, no writ) (newspaper advertisement and party admission); *Bobbitt v. Bass*, 713 S.W.2d 217, 220 (Tex. App.—El Paso 1986, writ dism'd) (testimony from third parties).

testimony concerning the deceased's statements." *Quitta v. Fossati*, 808 S.W.2d 636, 640–41 (Tex. App.—Corpus Christi 1991, writ denied).

Bryan's sons argue that Sherry's testimony about an agreement to be married is no evidence "because there is no evidence corroborating such an agreement and her testimony is therefore inadmissible under Rule 601." We disagree.

Here several witnesses testified about Bryan giving Sherry a wedding ring that had belonged to his mother. Bryan's father took the stand as the first witness and testified about the relationship between his son Bryan—who had the nickname "Tig"—and Sherry:

> Q.   Okay. And Tig, he got his mom's wedding ring—
>
> A.   Yes.
>
> Q.   —from you?
>
> A.   Yes.
>
> Q.   And later he gave that to Sherry; is that right?
>
> A.   Yes.

Second, Sherry's daughter gave similar testimony about the ring:

> He had a very beautiful ring. You know, he told my mom how much he loved her and, you know, just said he wanted to give her that ring. You know, because she was his wife and, you know, why do you have to have a piece of paper to say you're married if you're common law?

Later, a family friend named Sheryl Guss testified about the wedding ring:

> It was hard to think of them any other thing than husband and wife. And I know that she had a ring on her finger and it was like they made it

21

official type thing. Because he actually gave her Harriet's ring. That was his mom's ring when she passed. He gave it to her. And I don't think you'd give anyone your mom's ring, something that significant, if it wasn't a serious, like a promise.

These excerpts meet the test for corroboration. *See Bertucci*, 709 S.W.3d at 550 (stating that corroborating evidence "must tend to confirm and strengthen the testimony of the witness and show the probability of its truth"); *Quitta*, 808 S.W.2d at 640–41 (stating that corroborating evidence can include evidence of deceased's conduct that is generally consistent with testimony of deceased's statements). As a result, Sherry's testimony clears the hurdle posed by Rule 601(b) and was properly admitted. To be sure, several pieces of evidence indicated that there was no agreement to be married, such as Bryan's text message to Debbie saying "Hell no" when asked whether he and Sherry were married, or the Ameriprise financial paperwork in which he described Sherry as his girlfriend and not as his wife. Be that as it may, nothing in Rule 601(b) makes corroboration disappear when the evidence is conflicting.

The trial court, as the factfinder, could have credited Sherry's testimony concerning an agreement to be married, testimony that was corroborated by the testimony of Bryan's father, Sherry's daughter, and a family friend relating to the ring. *See McKeehan*, 554 S.W.3d at 698 (stating that factfinder is sole judge of witness credibility and may resolve conflicts in evidence). Sherry therefore presented some evidence on this element of informal marriage, such that the trial

court did not err by denying the motion for directed verdict asserted by Bryan's sons. *See Austin Bridge & Rd.*, 556 S.W.3d at 376 (applying "no evidence" standard of review to denial of motion for directed verdict). We further conclude that the trial court's implied finding that Sherry established this element of informal marriage is not "so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *See Cain*, 709 S.W.2d at 176; *Eris*, 39 S.W.3d at 714.

We overrule the two appellate issues raised by Bryan's sons.

## Conclusion

We affirm the judgment of the trial court.[10]

David Gunn
Justice

Panel consists of Chief Justice Adams and Justices Gunn and Guiney.

---

[10] We abated this appeal on July 24, 2025, because the trial court's judgment did not dispose of a request for attorney's fees under the Declaratory Judgments Act and therefore was not final on its face. *See Sealy Emergency Room, L.L.C. v. Free Standing Emergency Room Managers of Am., L.L.C.*, 685 S.W.3d 816, 825–26 (Tex. 2024). On August 20, 2025, the trial court signed a judgment for attorney's fees in favor of Sherry. We reinstate the appeal on this Court's active docket and issue this opinion and judgment.