**Opinion issued September 3, 2020**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-19-00014-CV

————————————

## IN THE MATTER OF BRENDA MARIE SMITH, DECEASED

On Appeal from County Court at Law No. 1
Fort Bend County, Texas
Trial Court Case No. 18-CPR-032536

## MEMORANDUM OPINION

This case arises out of a will-contest proceeding in connection with the Estate of Brenda Marie Smith, Deceased. Appellant, Chester Bullard, alleged that he was Brenda's common-law husband at the time of her death and sought, among other things, spousal support from the Estate. This assertion was contested by Brenda's other purported heirs, appellees Virgie McCann (Brenda's mother) and Sherrie

Robinson, Darlene McCann, and Margaret McKinney (Brenda's sisters). A jury found that Brenda and Bullard were not married, and Bullard now appeals. He argues in five issues that the trial court erred in admitting the testimony of an opposing expert witness based on alleged discovery failures and that the evidence was insufficient to support the jury's finding.

We affirm.

## Background

Brenda Marie Smith inherited an estate with an estimated value of between 20 and 30 million dollars from her husband, Dr. Larry Smith, when he died in 2010. Brenda died nearly seven years later on November 2, 2017. Brenda's mother and surviving sisters filed an application for probate of her will dated March 11, 2010 (the 2010 will), and Bullard—who had been Brenda's ranch manager—challenged their application, seeking instead to probate a different will dated February 23, 2014 (the 2014 will).

Bullard then applied for an allowance of $5,000 per week to pay living expenses and costs associated with managing Brenda's Estate, alleging that he was Brenda's common-law spouse. Brenda's mother and sisters (collectively, Contestants) opposed his application for a spousal allowance and contested the existence of the informal marriage.

Bullard moved for the trial court to hold a "separate, expedited trial" to resolve the issue of the existence of a common-law, or informal, marriage between himself and Brenda. *See* TEX. R. CIV. P. 174(b). The trial court granted his request and set the matter for a jury trial. Although Bullard failed to request any disclosures pursuant to Rule of Civil Procedure 194, the Contestants nevertheless served disclosures on Bullard prior to trial. Among the disclosures, the Contestants identified Janet Fenner Masson as an expert witness. The disclosure included Masson's full name, address, and phone number. It further stated:

> Ms. Masson is a forensic document examiner retained by Contestants in this matter. Ms. Masson has reviewed writing sample of Decedent Brenda Marie Smith and Chester Bullard. Ms. Masson will testify that certain purported signatures of Decedent Brenda Marie Smith are forgeries including but not limited to the purported signatures on the "Bullard Will" [the 2014 will]. Ms. Masson will further testify that, in her opinion, said forged signatures were written by Chester Bullard.

> Ms. Masson's CV is available upon request. The bases of her opinions are the documents reviewed, which are also available upon request, as well as her experience, skills, and training.

Bullard filed a pretrial motion in limine, asking that the Court order Contestants "refrain from making any mention . . . in any manner whatsoever concerning any of the matters hereinafter set forth, without first approaching the bench and obtaining a ruling from the Court outside the presence and hearing of all prospective jurors and jurors ultimately selected in this suit." At the pretrial conference, he announced that he and the Contestants had agreed to significant

portions of his motion, including the provision covering "[r]eference to any documents that were not produced or made available in response to a request for production or pursuant to Rule 194.2, or what such documents purportedly or might say." The trial court signed the order noting the agreed limine order.

After the limine order was signed, but before the presentation of evidence to the jury commenced, Bullard objected to admission of Masson's expert testimony, asserting that she was not properly designated because the Contestants had failed to provide all the supporting documents with their disclosure. He provided a brief in support of his argument, and he pointed to the language in the motion in limine referenced above. The Contestants asserted that they were never served with requests for disclosure, so Bullard's arguments did not apply to their voluntary disclosures. They asserted that they realized in preparing for trial that Bullard had never sought any disclosure, and, in the interest of fairness and expediency, voluntarily disclosed the necessary information, including making the supporting documents available for review. Contestants asserted that Masson had been available for deposition for "over a month" and that the parties "had this conversation a week ago regarding [Masson] and then they never said anything about her." The trial court overruled Bullard's objections.

At the trial, Bullard testified that he and Brenda had begun a romantic relationship in 2010 and began living together during the summer of 2012 at

4

Brenda's home, 5 Waters Lake Boulevard, in Missouri City, Texas. Bullard testified that he purchased a ring for Brenda, and they agreed to be married and celebrated their decision during a trip to San Antonio that occurred from December 29, 2012, to January 1, 2013. Bullard testified that, after they returned home from San Antonio, he and Brenda told others that they were married, including Brenda's mother and father and other family members. He also produced various documents referring to him as Brenda's husband. Bullard called his ex-wife, Sharon Bullard, and Michael Craig to testify as to the existence of an informal marriage between himself and Brenda.

The Contestants provided numerous witnesses and documents to support their assertion that Brenda and Bullard were not married. They pointed to inconsistencies in the documents relied upon by Bullard, many of which also contained references to Brenda's marital status as "widowed" or not currently married. They presented testimony from Masson that some of the documents purportedly signed by Brenda appeared to be forged. The documents that Masson testified were not signed by Brenda included certain tax documents and the 2014 will. They also presented the testimony of two private investigators who had conducted surveillance on Bullard and of Brenda's sisters, who testified that Brenda was not married, that Bullard had never lived with her at 5 Waters Lake, that Brenda herself identified Bullard as her

"boyfriend," not her husband, and that she was instead known in the family and community as the widow of Dr. Smith.

The jury charge included the following question:

> Two people are married if they agree to be married and after the agreement they lived together in Texas as spouses and they represented to others that they were married. Were Chester J. Bullard, Sr., and Brenda Marie Smith married? Answer yes or no.

The jury answered no, finding that Brenda and Bullard were not married.

Bullard subsequently moved for a judgment notwithstanding the verdict, or, in the alternative, a motion for new trial. The trial court severed this case from the underlying will-contest proceeding, denied Bullard's motion, and rendered judgment on the jury's verdict. Thus, the trial court's declaration that no informal marriage ever existed between Bullard and Brenda became a final judgment. This appeal followed.[1]

## Masson's Testimony

In his first four issues, Bullard argues that the trial court erred by allowing Masson to testify.

---

[1] The will-contest proceedings remain pending. The trial court's judgment in this case only addressed the issue of the existence of an informal marriage between Bullard and Brenda.

## A.  Standard of Review

Bullard's first four issues are, in essence, complaints about the admissibility of Masson's testimony.[2] We review a trial court's decision to admit or exclude evidence for an abuse of discretion. *Bay Area Healthcare Grp., Ltd. v. McShane*, 239 S.W.3d 231, 234 (Tex. 2007) (per curiam); *see also K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000) (reviewing trial court's decision to admit or exclude expert testimony for abuse of discretion). The trial court abuses its discretion when it acts in an unreasonable and arbitrary manner, or without reference to any guiding rules or principles. *U–Haul Intern., Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012); *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985) ("The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred."). We must uphold a trial court's evidentiary ruling if there is any legitimate basis in the record to support it. *Owens-Corning Fiberglass Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

Rule of Civil Procedure 194 governs requests for disclosure. Rule 194.1 provides that a

> party may obtain disclosure from another party of the information or
> material listed in Rule 194.2 by serving the other party—no later than

---

[2]  Bullard cites the standard for reviewing motions for new trial, but the remainder of his argument in issues one through four focuses on error in permitting Masson to testify over Bullard's objection.

30 days before the end of any applicable discovery period—the following request: "Pursuant to Rule 194, you are requested to disclose, within 30 days of service of this request, the information or material described in Rule [state rule, e.g., 194.2, or 194.2(a), (c), and (f), or 194.2(d)-(g)]."

TEX. R. CIV. P. 194.1. "[F]or any testifying expert," a party may request disclosure

of the following information:

(1) the expert's name, address, and telephone number;

(2) the subject matter on which the expert will testify;

(3) the general substance of the expert's mental impressions and opinions and a brief summary of the basis for them, or if the expert is not retained by, employed by, or otherwise subject to the control of the responding party, documents reflecting such information;

(4) if the expert is retained by, employed by, or otherwise subject to the control of the responding party:

(A) all documents, tangible things, reports, models, or data compilations that have been provided to, reviewed by, or prepared by or for the expert in anticipation of the expert's testimony; and

(B) the expert's current resume and bibliography;

TEX. R. CIV. P. 194.2(f). Rule 194.4 further provides:

Copies of documents and other tangible items ordinarily must be served with the response. But if the responsive documents are voluminous, the response must state a reasonable time and place for the production of documents. The responding party must produce the documents at the time and place stated, unless otherwise agreed by the parties or ordered by the court, and must provide the requesting party a reasonable opportunity to inspect them.

*Id.* R. 194.4.

8

Pursuant to Rule 194.3, the party responding to the request for disclosure "must serve a written response on the requesting party within 30 days after service of the request, except that: (a) a defendant served with a request before the defendant's answer is due need not respond until 50 days after service of the request, and (b) a response to a request under Rule 194.2(f) is governed by Rule 195." TEX. R. CIV. P. 194.3. Rule 195.2 provides that, unless ordered by the court, a party must designate experts "by the later of the following two dates: 30 days after the request is served" or "with regard to all experts testifying for a party seeking affirmative relief, 90 days before the end of the discovery period. . . ." TEX. R. CIV. P. 195.2.

A party has a duty to supplement its responses to written discovery:

(a) Duty to Amend or Supplement. If a party learns that the party's response to written discovery was incomplete or incorrect when made, or, although complete and correct when made, is no longer complete and correct, the party must amend or supplement the response:

(1) to the extent that the written discovery sought the identification of persons with knowledge of relevant facts, trial witnesses, or expert witnesses, and

(2) to the extent that the written discovery sought other information, unless the additional or corrective information has been made known to the other parties in writing, on the record at a deposition, or through other discovery responses.

TEX. R. CIV. P. 193.5. A party who fails to respond properly to discovery may be subject to having testimony excluded:

(a) Exclusion of Evidence and Exceptions. A party who fails to make, amend, or supplement a discovery response in a timely manner may not

9

introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified, unless the court finds that:

> (1) there was good cause for the failure to timely make, amend, or supplement the discovery response; or

> (2) the failure to timely make, amend, or supplement the discovery response will not unfairly surprise or unfairly prejudice the other parties.

TEX. R. CIV. P. 193.6.

## B.    Analysis

In his first issue, Bullard asserts that the Contestants were "required to fully comply with Rule 194.2(f) with regard to their handwriting expert, Ms. Janet Fenner Masson." He further asserts in his second issue that the Contestants were obligated to supplement voluntary discovery responses regarding Masson in accordance with Rule 193.5.

Bullard argues that the Contestants did not properly disclose Masson as a retained testifying expert, specifically because they did not identify or produce any documents along with the disclosure. The Contestants argue, however, that they were not obligated to comply with the requirements of Rule 194.2(f) because Bullard never requested any disclosures. We agree. *See, e.g.*, *Oyoque v. Henning*, No. 09-17-00018-CV, 2018 WL 1527892, at *4 (Tex. App.—Beaumont 2018, no pet.) (mem. op.) (agreeing that party did not have affirmative duty to designate experts because discovery requests had never been propounded to him).

10

The analysis of the Court of Appeals in *Oyoque* is compelling here:

Texas Rule of Civil Procedure 195.2 provides "[u]nless otherwise ordered by the court, a party must designate experts—that is, *furnish information requested* under Rule 194.2(f)—by the later of the following two dates: 30 days after the request is served, or . . . 60 days before the end of the discovery period." TEX. R. CIV. P. 195.2 (emphasis added). Moreover, the rules also provide "[a] party may request another party to designate and disclose information concerning testifying expert witnesses only through a request for disclosure under Rule 194 and through depositions and reports as permitted by this rule." *See* TEX. R. CIV. P. 195.1. The comments to Rule 194 indicate that "[d]isclosure is designed to afford parties basic discovery of specific categories of information, *not automatically in every case, but upon request*[.]" TEX. R. CIV. P. 194 cmt.1 (emphasis added). These rules do not impose a duty on a party not seeking affirmative relief to designate expert witnesses in the absence of a request.[3] *See In Interest of C.C.*, 476 S.W.3d 632, 638–39 (Tex. App.—Amarillo 2015, no pet.) (concluding

---

[3]    Bullard contends, without citation to authority, that the Contestants had an obligation to disclose their experts because they were seeking affirmative relief. We disagree, however, with this assessment of the pleadings. In this stage of the proceedings—a trial solely on the issue of the existence of an informal marriage between Bullard and Brenda—Bullard was the party seeking affirmative relief. As the person asserting the existence of the informal marriage and seeking a family allowance, Bullard himself bore the burden of proving the necessary elements. *See In re Estate of Mooney*, No. 01-18-00096-CV, 2019 WL 3917427, at *9 (Tex. App.—Houston [1st Dist.] Aug. 20, 2019, no pet.) (mem. op.) (citing *Small v. McMaster*, 352 S.W.3d 280, 282–83 (Tex. App.—Houston [14th Dist.] 2011, pet. denied)). The Contestants sought a declaratory judgment that no marriage existed between Brenda and Bullard as a defensive pleading to Bullard's own claims for affirmative relief. Such requests for declaratory judgment are not claims for affirmative relief. *See Garden Oaks Maint. Org. v. Chang*, 542 S.W.3d 117, 124 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("To qualify as a claim for affirmative relief, a defensive pleading must allege that the defendant has a cause of action, independent of the plaintiff's claim, on which he could recover benefits, compensation or relief, even if the plaintiff abandons his cause of action or fails to establish it."); *see also Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 164 (Tex. 1993) (holding that purpose of declaratory judgment is to declare existing rights or status and, thus, it cannot be invoked as affirmative ground of recovery to revise or alter such rights or actions).

that "the obligation to disclose the identity of a testifying expert arises when the information was requested under Rule 194.2(f)"); *In Interest of C.D.*, 962 S.W.2d 145, 147 (Tex. App.—Fort Worth 1998, no pet.) ("Because there was no discovery request to the ad litem, who represented a party (the children), the ad litem had no duty to disclose the evidence he would use or witnesses he would call.").

*Id.* As in *Oyoque*, Bullard never served requests for disclosure of expert witnesses on the Contestants. Thus, he cannot now complain that they failed to comply with provisions that apply in response to such a request. *See id.*; *In re C.C.*, 476 S.W.3d at 638–39, *In re C.D.*, 962 S.W.2d at 147.

Furthermore, the Contestants did substantially comply with Rule 194.2(f) despite Bullard's failure to request the disclosure. The Contestants' disclosure provided "the expert's name, address, and telephone number." TEX. R. CIV. P. 194.2(f)(1). It set out the "subject matter on which the expert will testify" by stating that Masson would testify as a "forensic document examiner" who had reviewed writing samples of both Bullard and Brenda and various documents purportedly signed by Brenda. *Id.* R. 194.2(f)(2). They also provided the "general substance of [Masson's] mental impression and opinions and a brief summary of the basis for them" by stating that, based on her review of the writing samples and purported signatures, Masson "will testify that certain purported signatures of Decedent Brenda Marie Smith are forgeries including but not limited to the purported signatures" on the 2014 will introduced by Bullard and that Masson "will further testify that, in her opinion, said forged signatures were written by Chester Bullard."

12

*Id.* R. 194.2(f)(3). Finally, the disclosure stated that Masson's CV, the documents she reviewed, and her experience, skills, and training were available upon request. *Id.* R. 194.2(f)(4); *see also id.* R. 194.4 (providing that, in some circumstances, responsive documents may be made available at "reasonable time and place" and that party responding to requests for disclosures with voluminous documents "must produce the documents at the time and place stated, unless otherwise agreed by the parties or ordered by the court, and must provide the requesting party a reasonable opportunity to inspect them"). Bullard never requested the disclosures, nor did he seek to inspect the documents identified in the Contestants' disclosure, so he cannot now complain that they were not produced to him.

Bullard also argues that the Contestants' voluntary disclosure of Masson as an expert witness triggered a duty to supplement the disclosure, which they failed to do. He does not identify any error or misleading omission in the disclosure that should have been corrected through supplementation. *See* TEX. R. CIV. P. 193.5 (providing that party must amend or supplement a response to request for written discovery if it "learns that the party's response to written discovery was incomplete or incorrect when made, or, although complete and correct when made, is no longer complete and correct"). He argues only that the Contestants never served him with copies of the documents that Masson relied upon in reaching her opinions.

As set out above, the disclosure expressly stated that these documents were available upon request. Thus, Bullard was notified prior to trial of the documents' existence. He nevertheless failed to request access to these documents, nor did he move to compel production of the documents referenced in the voluntary disclosure, and so this argument is unavailing. *See Remington Arms Co. v. Caldwell*, 850 S.W.2d 167, 170 (Tex. 1993) ("[T]he failure to obtain a pretrial ruling on discovery disputes that exist before commencement of trial constitutes a waiver of any claim for sanctions based on that conduct."); *Mandell v. Mandell*, 214 S.W.3d 682, 691–92 (Tex. App.—Houston [14th Dist.] 2007, no pet.) (objecting party "waived any complaint about the Estate's failure to supplement discovery responses by first refusing the Estate's offer of the documents" and by failing to obtain ruling compelling discovery prior to start of trial); *see also Safeco Surety v. J.P. Sw. Concrete, Inc.*, No. 01-12-00672-CV, 2013 WL 5820619, at *8 (Tex. App.—Houston [1st Dist.] Oct. 29, 2013, no pet.) (mem. op.) (holding trial court did not abuse discretion in admitting documents that were inadvertently omitted from expert report because information disclosed by producing party alerted opponent to documents' existence and opponent nevertheless failed to notify producing party that documents were not attached to expert report); *Williams v. Cnty. of Dallas*, 194 S.W.3d 29, 32–33 (Tex. App.—Dallas 2006, pet. denied) (holding trial court did not

abuse its discretion in admitting undisclosed documents supporting damages where face of pleading indicated that such damages would be sought at trial).

We also observe that, despite his allegations that the Contestants failed to supplement the disclosure with necessary supporting documents, Bullard nevertheless had sufficient information about Masson's opinion to prepare an objection to her testimony—including a written brief on that subject—that he asserted prior to the start of trial. *See, e.g.*, *Kingsley Props., LP v. San Jacinto Title Servs. of Corpus Christi, LLC*, 501 S.W.3d 344, 353 (Tex. App.—Corpus Christi–Edinberg 2016, no pet.) (holding that duty to supplement "require[s] that opposing parties have sufficient information about an expert's opinion to prepare a rebuttal with their own experts and cross-examination, and that they be promptly and fully advised when further developments have rendered past information incorrect or misleading") (quoting *Exxon Corp. v. W. Tex. Gathering Co.*, 868 S.W.2d 299, 304 (Tex.1993)).

We overrule Bullard's first and second issues.

In his third issue, Bullard argues that the trial court erred in allowing Masson to testify despite the parties' motion in limine prohibiting reference to documents that were not produced in accordance with Rule 194.2. He refers to the agreed order in limine as an agreement that certain documents were not admissible, but this

15

construction of the order is not consistent with the language of the order itself or the general practice regarding motions in limine.

A motion in limine is a procedural device that permits a party to identify, before trial, certain evidentiary rulings that the court may be asked to make. *Fort Worth Hotel LP v. Enserch Corp.*, 977 S.W.2d 746, 757 (Tex. App.—Fort Worth 1998, no pet.) (op. on reh'g); *see also In re Toyota Motor Sales, U.S.A., Inc.*, 407 S.W.3d 746, 760 (Tex. 2013) (orig. proceeding) (stating that limine order alone does not preserve error). A ruling on a motion in limine does not exclude evidence, but merely requires counsel to approach the bench before any matters within the scope of the order are mentioned in front of the jury. *Gutierrez v. Gutierrez*, 86 S.W.3d 729, 733 n. 8 (Tex. App.—El Paso 2002, no pet.).

Bullard's motion in limine—agreed to by the Contestants in relevant part—required the parties to "approach[] the bench and obtain[] a ruling from the Court outside the presence and hearing of all prospective jurors and jurors ultimately selected in this suit" prior to discussing certain matters, including making "[r]eference to any documents that were not produced or made available in response to a request for production or pursuant to Rule 194.2, or what such documents purportedly or might say." This agreed limine order is not an agreement to exclude evidence, and, as such, is not an independent basis for excluding Masson's testimony. *See id.*

16

We overrule Bullard's third issue.

In his fourth issue, he argues that the trial court erred in admitting Masson's testimony because the Contestants failed to comply with the above-referenced rules of discovery and with the limine order. For the reasons set out above, we conclude that trial court acted within its discretion in rejecting Bullard's arguments based on Rules 194.2(f) and 193.5 and the agreed limine order and in allowing Masson to testify. *See McShane*, 239 S.W.3d at 234; *Honeycutt*, 24 S.W.3d at 360.

We overrule Bullard's fourth issue.

## Sufficiency of the Evidence

In his fifth issue, Bullard argues that the jury's verdict is not "factually supported by the evidence."

### A.    Standard of Review

When a party attacks the legal sufficiency of an adverse finding on an issue for which he had the burden of proof, he must demonstrate on appeal that the evidence conclusively proves as a matter of law all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). We consider all of the evidence in the light most favorable to the finding, crediting favorable evidence if reasonable factfinders could and disregarding contrary evidence unless reasonable factfinders could not. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). The ultimate test for legal sufficiency is whether the

17

evidence would enable a reasonable and fair-minded factfinder to reach the finding under review. *Id.*

When a party challenges the factual sufficiency of an adverse finding on an issue for which he has the burden of proof, the challenge will be sustained only if the finding is so against the great weight and preponderance of the evidence as to be clearly wrong and unjust. *Dow Chem. Co.*, 46 S.W.3d at 242. We must consider and weigh all of the evidence and can set aside the finding only if the evidence is so weak or if the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Id.*

## B.    Law Governing Informal Marriage

Family Code section 2.401 provides that an informal marriage may be proved by evidence that the parties "agreed to be married and after the agreement they lived together in this state as husband and wife and there represented to others that they were married." TEX. FAM. CODE § 2.401(a)(2); *In re Estate of Mooney*, No. 01-18-00096-CV, 2019 WL 3917427, at *9 (Tex. App.—Houston [1st Dist.] Aug. 20, 2019, no pet.) (mem. op.); *Assoun v. Gustafson*, 493 S.W.3d 156, 160 (Tex. App.—Dallas 2016, pet. denied). "The statutory requirement of 'represented to others' is synonymous with the judicial requirement of 'holding out to the public.'" *Eris v. Phares*, 39 S.W.3d 708, 714–15 (Tex. App.—Houston [1st Dist.] 2001, pet. denied). The party seeking to establish the existence of the informal marriage bears the

18

burden of proving the three elements by a preponderance of the evidence. *In re Estate of* Mooney, 2019 WL 3917427, at *9; *Small v. McMaster*, 352 S.W.3d 280, 282–83 (Tex. App.—Houston [14th Dist.] 2011, pet. denied). An informal marriage does not exist until the concurrence of all three elements. *Small*, 352 S.W.3d at 283.

**C.    Analysis**

Regarding the first element—an agreement to be informally married—Bullard points primarily to his own testimony. *See Small*, 352 S.W.3d at 283; *see also Russell v. Russell*, 865 S.W.2d 929, 933 (Tex. 1993) (stating that each element of claim for informal marriage may be established by circumstantial, as well as direct, evidence). He testified that he and Brenda agreed to be married around New Year's Day in 2013 and that they lived together at 5 Waters Lake. *See Assoun*, 493 S.W.3d at 160 (holding that evidence of cohabitation and "holding out" in some cases may constitute some evidence of agreement to be married, but evidence of holding out "must be particularly convincing to be probative of an agreement to be married"). Bullard acknowledged that there were no witnesses to their decision to marry, and he had no receipts or other documents to corroborate his testimony regarding the trip to San Antonio.

Other evidence undermines Bullard's testimony on this topic. Brenda's sisters testified that they were close to their sister, but she never mentioned her intention to marry Bullard or referred to Bullard as her husband. *See Eris*, 39 S.W.3d at 714

19

(stating that, to establish element of agreement to be married, evidence must show parties intended to have present, immediate, and permanent marital relationship). Robinson specifically testified that, during the purported trip to San Antonio to get married, she was present at Brenda's home three days a week and she did not think that Brenda had traveled at all during that time. She further testified that there was no announcement of a marriage between Brenda and Bullard, nor was there a celebration of any kind. Bullard testified that he gave Brenda a ring to commemorate their nuptials, but her sisters testified that they never saw Brenda wear any ring except for her wedding ring from Dr. Smith.

Regarding the second element—cohabitation—Bullard again points to his own testimony that he lived with Brenda at 5 Waters Lake. He also points to his driver's license listing 5 Waters Lake as his address, and he identified other documents, such as Brenda's medical records listing him as a resident at her home and a business account application at Wells Fargo Bank, purportedly signed by Brenda, that listed his address as 5 Waters Lake. The Contestants point out, however, that the driver's license was obtained after Brenda's death. And the medical records are inconsistent. Although there is a notation from a nurse that Brenda would receive post-surgical help from her "husband," other documents dated after the purported marriage contain Brenda's representations that she was "widowed" and not currently married. Brenda's emergency contact was her sister, Sherrie Robinson, and Brenda

authorized release of her medical information to Robinson, not Bullard. Brenda's psychiatrist likewise provided notes and records that identified Bullard as Brenda's "partner" or "beau" and referenced only her 20-year marriage to Dr. Smith.

The Contestants also provided testimony contradicting Bullard's account. Robinson testified that after her sister was widowed, she needed help at the house. Robinson testified that she went to work for Brenda and was present at Brenda's 5 Waters Lake home every Monday, Tuesday, and Wednesday from January 2011 until September 2013. Robinson testified that Brenda never told her that she was married to Bullard and that she had never seen any evidence that Bullard lived at 5 Waters Lake. Another sister, Margaret McKinney, testified that she stayed with Brenda three days a week and cleaned and organized the home for Brenda. She never witnessed Bullard spend the night at Brenda's home and never ate a meal with him there. Brenda's sister Darlene McCann likewise testified that she lived with Brenda until late 2014 and visited regularly thereafter until Brenda's death. McCann testified that Bullard did not live at 5 Waters Lake during the time she lived there (including more than a year after the purported marriage), and she never observed any of Bullard's personal effects in the home. The Contestants provided pictures from the home, including pictures of the closet in Brenda's room, taken just days after her death. These pictures demonstrated that the closets did not contain any male clothing or personal items that could have belonged to Bullard.

21

Finally, regarding the third element—"holding out" as a married couple—Bullard identifies several occasions on which he and Brenda referred to one another as husband and wife. *See Winfield v. Renfro*, 821 S.W.2d 640, 648 (Tex. App.—Houston [1st Dist.] 1991, writ denied) (stating that representations to others, or "holding out," may be established by parties' conduct and actions that are sufficient to constitute representation to public that marriage exists). Bullard testified that Brenda's family was aware that he and Brenda had married and had identified them as a married couple on multiple occasions. This included the obituary for Brenda's father, who died in 2016. The obituary stated that Brenda's father was "survived by his wife, Virgie; four daughters: Brenda Bullard and husband Chester. . . ." Bullard also asserts that they continued representing to others that they were married, including to Brenda's medical providers. Bullard also pointed to tax documents showing that he and Brenda filed the first "married filing jointly" tax return for the 2013 tax year. *See Russell*, 865 S.W.2d at 933 ("If the statement is made in a self-serving context, the fact-finder may be expected to disbelieve the truth of the statement.").

Undermining Bullard's contention, however, was evidence of many instances in which Brenda and Bullard did not hold them selves out as married, sometimes within the same documents that he relied upon. As discussed above, the medical records identified by Bullard also contain forms in which Brenda noted that she was

22

widowed or unmarried. Brenda's sisters further provided testimony that the other documents relied upon by Bullard, such as Brenda's obituary and that of her father, identified Bullard as her husband at Bullard's own insistence, not because of a generally-known marriage between him and Brenda. And other documents related to Brenda's burial likewise fail to mention her purported marriage to Bullard. The funeral home's documents identified Bullard as Brenda's "companion." The "Facts of Death Verification" that was signed by Bullard days after Brenda's death represents that her marital status at the time of her death was "widowed."

Additionally, the testimony of Robinson and McKinney, stating that Brenda never represented herself as being married to Bullard contradicts Bullard's own assertions. *See Small*, 352 S.W.3d at 285 ("Whether the evidence is sufficient to establish that a couple held themselves out as husband and wife turns on whether the couple had a reputation in the community for being married."); *Smith v. Deneve*, 285 S.W.3d 904, 910 (Tex. App.—Dallas 2009, no pet.) (stating that "holding out" element of informal marriage "requires more than occasional references to each other as 'wife' and 'husband,'" and "a couple's reputation in the community as being married is a significant factor in determining the holding out element"). McKinney, in particular, testified that Brenda's reputation in the community was as Dr. Smith's wife and widow and that she was not aware of anyone in town that considered Brenda to be married to Bullard. Darlene McCann likewise testified that Brenda was

not married to Bullard. McCann testified that, on one occasion, Bullard told their brother that he and Brenda were married. The brother then asked Brenda if she and Bullard were married. Brenda denied being married and stated that Bullard "just likes to tell people stuff like that."

The Contestants presented evidence of a similar conversation between Brenda and her financial advisor, Christopher Moore. Moore testified via deposition that he contacted Brenda in the month before her death. A man named Chester answered the phone and identified himself as Brenda's husband. Moore asked Brenda if she was married and she answered no, stating that "Chester is my boyfriend. He just likes to say that." *See Small*, 352 S.W.3d at 285 ("Proving a reputation for being married requires evidence that the couple 'consistently conducted themselves as husband and wife in the public eye or that the community viewed them as married.'"). Bullard did not present any witness from outside his own social circle who testified that he and Brenda had a reputation as being married. Even Bullard's own witness, Michael Craig, a part-time worker, testified that Brenda herself never told him that she was married to Bullard.

Thus, although Bullard presented some evidence relevant to the elements of an informal marriage, the evidence was contradicted and not sufficient to conclusively prove as a matter of law all vital facts in support of the existence of an informal marriage. *See Dow Chem. Co. v. Francis*, 46 S.W.3d at 241; *see also* TEX.

24

FAM. CODE § 2.401 (elements of informal marriage); *In re Estate of Mooney*, 2019 WL 3917427, at *9 (same). The evidence is, therefore, legally sufficient to support the jury's finding.

And Bullard's evidence that he and Brenda agreed to be married, cohabitated at 5 Waters Lake, and represented to the community that they were married is not so strong that the jury's finding is "so against the great weight and preponderance of the evidence as to be clearly wrong and unjust." *See Dow Chem. Co.*, 46 S.W.3d at 242. The evidence presented to the jury to establish the marriage was, at best, conflicting. "Where the evidence is conflicting about the existence of an informal marriage, the conflict must be resolved by the factfinder." *In re J.G.S.*, No. 05-18-00452-CV, 2019 WL 336543, at *3 (Tex. App.—Dallas 2019, no pet.) (mem. op.); *see also Small*, 352 S.W.3d at 282 ("The existence of an informal marriage is a fact question[.]").

Bullard's own testimony and evidence establishing that he and Brenda were informally married and that, at least on occasion, represented that they were married is insufficient to outweigh other evidence that there was no indication that Bullard actually lived with Brenda or that they consistently represented to others that they were married such that they developed a reputation in the wider community as husband and wife. *See Small*, 352 S.W.3d at 285 (noting, in reversing jury verdict finding informal marriage, that all of putative wife's evidence supporting informal

25

marriage "came from her personal circle of acquaintances whose testimony provides little, if any, indication of [the couple's] reputation in the community" and that there was no testimony that couple "had a reputation in the wider community as being married"); *Danna v. Danna*, No. 05-05-00472-CV, 2006 WL 785621, at \*1–2 (Tex. App.—Dallas Mar. 29, 2006, no pet.) (mem. op.) (noting that although putative wife seeking to establish informal marriage presented evidence from four witnesses that they had heard putative wife and putative husband refer to each other as spouses, plus some forms purportedly signed as husband and wife, the evidence was nevertheless insufficient because no evidence demonstrated that parties consistently conducted themselves as husband and wife in public or that community viewed them as married). Thus, the evidence is likewise factually sufficient to support the jury's finding. *See Dow Chem. Co.*, 46 S.W.3d at 242.

We overrule Bullard's fifth issue.

## Conclusion

We affirm the judgment of the trial court.


Richard Hightower
Justice

Panel consists of Justices Lloyd, Goodman, and Hightower.

26